Calhoon et al. *v.* Pittsburgh Coal Company et al. (Alexander, Appellant).

Argued April 23, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Frank E. Reed,* of *Bradshaw, McCreary, Stevenson & Reed,* for appellant.

*J. Leonard Solomon,* with him *Effie M. Solomon* and *Swaney & Lucas,* for appellees.

OPINION BY JAMES, J., October 27, 1937:

Bessie M. Calhoon and her husband, Thomas F. Calhoon, brought an action for trespass against the Pittsburgh Coal Company, William Semple Ferry Company and E. P. Alexander, for personal injuries suffered by

the wife, caused by her slipping on ice on the roadway leading to the ferry landing at Georgetown on the Ohio River, in Beaver County, Pa. At the trial, it appeared that the Pittsburgh Coal Company was the owner of the land and E. P. Alexander was operating the ferry between the Borough of Georgetown and Smith's Ferry, under an agreement with the William Semple Ferry Company. Points for binding instructions, submitted by all defendants, were refused and the case was submitted to the jury, which found for each plaintiff against all of the defendants. Motions for judgment n. o. v. by the defendants were granted as to the Pittsburgh Coal Company and William Semple Ferry Company, but refused as to E. P. Alexander, and judgments were entered on the verdicts against him. From these judgments, he has appealed.

On January 28, 1935, Bessie M. Calhoon, accompanied by her son, Norman, fourteen years of age, left her home in the Borough of Georgetown, at about 6 P. M., to attend a concert at the Midland High School. The evening was clear and cold, and snow and ice were upon the sidewalks and highways. The Borough of Georgetown is situated on a hill overlooking the Ohio River. To reach Midland, it was necessary for plaintiff to board the ferry operated from Georgetown, on the east bank of the Ohio River, to Smith's Ferry, on the west bank. Plaintiff walked about three blocks to the top of the hill leading to the ferry, when she left the highway, took a shortcut and walked down steps provided by the ferry company. At the bottom of the steps, she again entered upon the highway, which was a continuance of the one which she had left at the top of the steps. This highway leads to the platform of the ferry at the water's edge. From the foot of the steps, the land slopes to the water's edge, a distance of seventy-five feet. Approximately fifteen or twenty feet from the edge of the apron of the ferry, plaintiff, who was being assisted by her son, slipped and fell on the icy roadway, sustaining

the injuries for which suit was brought. At this point, the roadway is built with cobblestones. This highway is on Pennsylvania Legislative Route 278 and Traffic Route 168, as fixed by the Secretary of Highways, and is the only one crossing the Ohio River within five miles of Smith's Ferry and Georgetown.

Appellant's main contentions are: First, that it was not liable for the icy condition of a state highway; and, second, the plaintiff was guilty of contributory negligence.

Counsel for appellees earnestly argues that the testimony is conflicting as to whether the accident took place on the public highway or a private right of way. As we view this record, the accident occurred on the public highway; the case was submitted to the jury on that theory, and was so considered by the court below in disposing of the motions for judgment n. o. v.

In her examination in chief, Mrs. Calhoon testified: "A. Well, I was going down to the ferry to cross the river with my son on my way to Midland to this festival, and I was midway, I suppose, to the ferry place where you board the ferry when I slipped on the ice and fell." On cross-examination: "Q. And you say when you got about midway from the bottom of the steps to the apron of the ferry that you then slipped and fell? A. I did." When asked to point out in an exhibit, she was unable to positively fix where she fell, and testified: "Q. In any event, Mrs. Calhoon, it happened along the roadway, didn't it? A. It happened on that way, yes, down from the steps." Concluding the cross-examination on this point, the record is as follows: "The Court: I think the witness is about right, she could not definitely say; she said it was in the roadway. Mr. Bradshaw: If that is the testimony we will let it go at that. That is the way we understood it, but we wanted to make it clear. The Court: I have it here, 'on the roadway down to the ferry.'"

Norman Calhoon testified: "A. . . . . . .got down to

the ferry steps and I held to her arm going down them to steady her and trying to keep her from slipping, and we got down the steps all right and got down to what we call the landing at the river there and when we got about midway she slipped and fell...... Q. And now as you came down these steps that night did you walk straight or turn to the left just a little? A. As we came down the steps we came right down along the left side of the road. Q. You sort of followed the contour of the road, didn't you? A. Yes." This witness indicated upon a photograph, by an X mark, the point where his mother fell, which from our examination was within the traveled roadway. Conceding to appellees every favorable inference which can fairly be deduced from the language, "along the roadway" and "along the left side of the road," it would be an unwarranted inference to find, as thus described, that the accident occurred upon a private right of way.

The court below, in dismissing appellant's motion, based its decision chiefly on the ground that the so-called highway, used by appellant, at the water's edge as a landing, was in fact private property. He said in part: "But the road in question was not a public highway except in a modified sense. It was the private property of the ferry, dedicated to public use only as a means of entering and leaving the ferry, and, at the place of the accident, had, of necessity, to be used by both pedestrians and vehicles. The ferry across the Ohio River from Smiths Ferry to Georgetown is, and has been for the past century, a public ferry, carrying passengers for hire, and enjoying the franchise and privileges of such an undertaking. Its property, which includes the lands occupied by the approaches to the ferry boats from the public highways, is private property, over and on which only patrons and passengers of the ferry had a right of passage. These approaches to the ferry were never made public roads or highways by view, purchase, condemnation, or any other process,

but were always, and are yet, under the exclusive owner-
ship and control of the ferry, subject only to the rights
and uses of passengers and patrons of the ferry. These
are matters within the knowledge of the court, known
of all men for many years, and of which the court takes
judicial notice."

The fallacy in the statement of the learned judge of
the court below, above quoted, is in judicially noticing
some facts without regard to the evidence in the case.
Mr. Calhoon, on cross-examination, testified he remem-
bered that the roadway and the ferry had been in use
since his boyhood days—a period of about fifty years.
He also testified he had used the road and ferry going
to and from his daily work for the past seventeen years,
during which time the roadway was in constant public
use. The roadway was in existence as a public highway
at least as early as 1911, for it was in that year the
state legislature designated the route, of which this
roadway and ferry line are a part, as a state highway.
The roadway was probably used by the public for many
years before that, as the court below stated that the
ferry line had been in constant operation for the past
century. This constant use of the roadway by the public,
continuing for well over twenty-one years with the ap-
parent consent of the owners and occupiers of the land,
had the same effect as a formal dedication of the road-
way to public use. It is not necessary to the dedication
of a public road that there be "view, purchase, con-
demnation, or any other process." No formal accept-
ance of a road by public authorities is necessary to
make it a public highway. Use of a road by the public
over a period of time is a sufficient acceptance. A road-
way having become a public highway, the duty of main-
taining and repairing it thereafter falls upon the public:
*Ackerman v. Williamsport*, 227 Pa. 591, 76 A. 421;
*Kniss v. Borough of Duquesne*, 255 Pa. 417, 100 A. 132;
*Felt v. West Homestead Boro.*, 260 Pa. 11, 103 A. 508;
*Gass v. City of Pittsburgh*, 91 Pa. Superior Ct. 290;

which in this case is the Borough of Georgetown. Whether the Department of Highways took over the road does not matter. The Commonwealth, being sovereign, cannot be sued without its consent for failure to properly maintain a highway: *Collins v. Com.*, 262 Pa. 572, 106 A. 229; *Swift v. Com.*, 262 Pa. 580, 106 A. 232. The Borough of Georgetown remained responsible for the condition of the highway whether it became a state highway or not: *McCracken v. Curwensville Boro.*, 309 Pa. 98, 163 A. 217. If there was any duty upon the appellant to maintain the highway in good repair, in spite of the fact that it was a public road, the appellees failed to show it. The burden of showing any such duty was on them.

The chief contention of the appellees is that even though the highway was public, the duty of appellant, as a ferryman, to furnish safe means of ingress and egress to and from his ferry boat, made him responsible for the condition of the road where Mrs. Calhoon fell. They rely on the case of *Bauer v. Verona Ferry Co.*, 33 Pa. Superior Ct. 607. In that case, the defendant ferry company operated a ferry line across the Allegheny River, between Montrose and Verona. Plaintiff, driving his wagon loaded with household goods, boarded defendant's boat at Montrose, and was ferried across the river to Verona. The landing at Verona was the bank of the river at the end of a street. When the boat came within two or three feet of the street landing, it was stopped. There was no apron or falling curtain on the boat to gap the space between it and the street. This space was covered with water. Upon inquiry by plaintiff, the boatman told him that it was safe to drive his team directly off the end of the boat through the water onto the street. He drove his team off the boat toward the street and the horses stumbled in a sand hole in the river, the wagon bearing down on and seriously injuring them. Plaintiff was held entitled to recover the loss he sustained from the defendant

ferry company. In delivering the opinion of the Superior Court, Judge BEAVER said (p. 609) : "'A ferryman must maintain safe and suitable landing places for the ingress and egress of passengers and teams, and appliances of sufficient strength to hold the boat securely to her moorings, but he is not bound to guard against all possible accidents which could not reasonably have been foreseen, nor is he bound to adopt new and improved methods, where those already in use are reasonably safe. The duty as to the safety of landings applies not only to the immediate means of getting on and off the boat, but requires the ferryman to furnish safe passageways between the ferryhouses *and the streets'*." (Italics supplied). This is but one of a long line of cases holding that from the time a passenger leaves the public highway and enters the premises, occupied by a carrier, until he leaves the carrier's premises, for the public highway, the carrier is bound to provide safe means of passage between the public highway and the carrier's means of transportation.

Thus, the failure of a ferryman to provide a safe gangplank between his boat and the shore for entering (*McBride v. McNally,* 243 Pa. 206, 89 A. 1131; *Finnegan v. Delaware River Ferry Co.,* 68 Pa. Superior Ct. 428) or leaving (*Amos v. Delaware River Ferry Co.,* 228 Pa. 362, 77 A. 12; *Bauer v. Verona Ferry Co.,* supra) the boat is negligence toward passengers. The rule that a carrier must provide safe means of passage between public streets and the carrier's means of transportation applies not only to ferrys, but to railroads (*Norris v. Penna. R. R. Co.,* 317 Pa. 586, 177 A. 785), street railways (*Lasater v. Conestoga Traction Co.,* 306 Pa. 500, 160 A. 447), taxicabs (*Hughes v. Pittsburgh Transportation Co.,* 300 Pa. 55, 58, 150 A. 153), motor busses (*O'Malley v. Laurel Line Bus Co.,* 311 Pa. 251, 254, 255, 166 A. 868) and airplanes as well (*Law v. Transcontinental Air Transport,* 1931 U. S. Av. R. 205 (U.S. D. C. E. D. Pa.). But this rule applies only while the

traveler is a passenger of the carrier. It does not apply after the passenger has left the carrier's premises: *Scanlon v. Phila. R. T. Co.,* 208 Pa. 195, 197, 198, 57 A. 521; *Furby v. Penna. R. R.,* 286 Pa. 85, 87, 88, 132 A. 796; *Perret v. George,* 286 Pa. 221, 223, 224, 133 A. 228. Nor does it apply where, as in the present case, the intending passenger has not yet reached the carrier's premises: *Klingensmith v. West Penn Rys. Co.,* 279 Pa. 336, 339, 123 A. 787; *Martin v. Steen,* 109 Pa. Superior Ct. 263, 272, 167 A. 609. See *Furby v. Penna. R. R.,* supra. In the present case, Mrs. Calhoon was still on the public highway. She had not yet reached the means of passage between the highway and the ferryboat, for the safety of which the ferry operator was responsible. For the condition of the steps, by which Mrs. Calhoon descended to the river highway, the ferryman would have been liable, as they were part of the premises used by him for the convenience of his passengers. However, when Mrs. Calhoon left the steps and entered upon the highway, she was no longer upon the premises of the ferryman, and he was under no greater duty than if she had proceeded all the way down the hill on the public highway, which led to the ferry landing. Nor is the responsibility for the highway to be placed upon the operator of the ferry because it landed at a public highway. At just what point the liability of the ferryman begins, it is unnecessary for us to decide; but the point at which this accident occurred was at least fifteen feet from the apron upon which the prospective passengers would board the ferry. This point was not part of the landing to the ferry. Consequently, the appellant is not liable for the injuries suffered by Mrs. Calhoon.

In view of our conclusion that the appellant is not responsible for the condition of the highway, at the point where the accident occurred, we shall not discuss other questions raised in the briefs.

The first, second, fourth, fifth and sixth assignments of error are sustained, the judgments of the lower court

are reversed, and the record is remitted to the court below with directions to enter judgment n. o. v. in favor of the appellant.