La Sota *v.* Philadelphia Transportation
Company, Appellant.

Argued January 4, 1966.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*William J. McKinley, Jr.,* for appellant.

*Sheldon L. Albert,* with him *James E. Beasley,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, May 2, 1966:

In the early morning of March 25, 1958, Phyllis La Sota boarded in Philadelphia an autobus of the Philadelphia Transportation Company, which was to take her to Roosevelt Boulevard and Adam Avenue, this particular stop being known as "the Sears-Roebuck" stop. By the time the bus arrived at a point designated as East of Broad Street, the bus had acquired such an influx of passengers that they occupied all the seats, crowded the aisles, jostled forward and across the dividing white line behind the driver's seat (and beyond

which passengers were not to go) and massed into the stairwell leading to the front door. As the bus proceeded over the stretch between East of Broad Street and the Sears-Roebuck stop, a distance of about two miles, the passengers stirred, pushed and shoved backward and forward and from side to side, creating a situation of disorder which was wholly ignored by the bus driver.

When the bus arrived at the Sears-Roebuck stop, Mrs. La Sota rose from her seat but, on account of the multitude of persons encumbering the aisles, surrounding the coin box and jamming against the sides of the passageway, it took her some two minutes to reach the top of the stairwell where she was unable to obtain protection of the handrailing because of the people huddled against it. At this point a surging movement of the impatient passengers threw her forward catapulting her out onto the pavement opposite the opened doors. The accompanying violence inflicted on her serious injuries. With her husband, she entered suit against the Philadelphia Transportation Company and the jury returned a verdict in favor of the plaintiffs.

The defendant company asks for judgment n.o.v., contending that it breached no duty owing to Mrs. La Sota. Whatever injuries she sustained, the defendant argues, resulted from the rudeness of her fellow-passengers, over which it had no control, and that her injuries happened after she had reached her destination. What duty did the carrier owe to Mrs. La Sota? By taking her fare, it committed itself to the responsibility of transporting her safely and *delivering* her safely. It would little serve a passenger to transport him·safely and treat· him with kindness throughout the entire journey and then kill him with negligence at the end. In *Lyons v. Pitts. Rys. Co.*, 301 Pa. 499, re-approved in *Brown v. Ambridge Yellow Cab Co.*, 374 Pa. 208, 212, this Court said: " 'A common carrier for hire owes

to its passengers the highest degree of care and diligence in carrying them to their destination and [in] enabling them to alight safely (Hughes v. Pittsburgh Transportation Co., 300 Pa. 55) and to avoid any possible danger while doing so.' "

The defendant company maintains that it cannot supervise the conduct of its passengers, and advances the strange proposition that it cannot be held responsible for misconduct on the part of its transportees unless what they do amounts to a breach of the peace. But it would indeed be a sorry state of affairs if a passenger would have no protection from unruliness and misbehavior in a railroad car, streetcar or autobus unless tumult in the vehicle reached that state of disorderliness that it called for the intervention of the police or the marines. The defendant's argument, in this respect, peculiarly enough, seems to have some ostensible authority because in *Ellinger v. Philadelphia, Wilmington, etc.,* 153 Pa. 213 (decided in 1893) this Court said: "Unless such conduct amounts to a breach of the peace the officers of the law can take no cognizance of it, and carriers are not bound to prevent it or liable in damages for its appearance about their stations or trains." This statement, as one reads that case, is dictum and was obviously the unrestrained thought of the opinion writer who remained aboard the vehicle of enthusiastic expression which went beyond the station of the required factual adjudication. Nevertheless, the cited statement, standing alone, and unmodified by circumstance, is untenable and it is hereby repudiated as bad law. To say that a woman passenger traveling alone has no protection from ruffianism unless it degenerates into riot is an unsupportable proposition in our, we hope, now enlightened and humane interpretation of the duties of common carriers.

The defendant argues further that it cannot possibly anticipate what passengers might do and it cor-

rectly says that it is required by law to transport all types of passengers ostensibly fit for transportation. It cannot inquire into their manners before selling them tickets. This is true but when it becomes evident to the carrier, and its agents, servants and employees, that what appeared to be a decent, well-behaved individual has transformed himself into something else, and the carrier has an opportunity to curb his transgressing onto the safety and comfort of others, the carrier must act to protect the other passengers from his misbehavior. The carrier cannot argue, in this case, that it had no way of anticipating the incident which struck down Mrs. La Sota.

Of course, if passengers have been well-behaved throughout the journey and then suddenly at the end of the journey, like the wild animals leaving Noah's Ark in unrestrained disportation over the ending of their long enforced captivity, break out into uninhibited and unruly performances, the defendant might well plead unawareness. But that is not this case. The evidence is clear that throughout the two-mile trip, with the bus having made four stops, the passengers on this particular autobus were disposed to unruliness, mostly caused undoubtedly by the fact that they had been sardined into a space which did not allow most of them to stand comfortably or even to breathe properly. The controlling law and regulations permitted 20 standees in this bus. While the record contains no numeral count of the passengers in this bus, there is a plethora of evidence that the vehicle was crammed, crowded and packed beyond the allowable margin of standees. This superfluity of voyagers not only worked havoc on the comfort and safety of the whole human cargo, but it also could have endangered the navigation of the bus itself. To allow the driver freedom of movement in handling his controls no passenger was allowed to go beyond the already mentioned white line

nor was he to occupy the enclosure described as the standwell where bumping or jostling in the hurried movements of a boarding or leaving passenger could easily precipitate mishap.

The bus driver could not but know, if he had the slightest regard for the responsibilities of his steward-ship, that all was not well in the bus, whose sole master he was. The evidence is that a "mob of people" boarded the bus, they were "packed like sardines," the crowded condition was such that at stops, standing passengers had to get off in order to allow a departing passenger to get out and then the standees would re-board the bus. The standees in the bus were in constant boisterous pedal commotion.

When it became evident to the driver that the churning and agitation within his vehicle was getting out of hand, it was his duty to quell the disorder which might well be mounting up into undeserved injury to one or more of the patrons. He could have stopped the bus and demanded quiet and order, or he could have required the troublemakers to leave the bus. He did nothing. He did not even look inside the bus; he "hated" passengers.

In *Kennedy v. Penna. R.R. Co.*, 32 Pa. Superior Ct. 623, the Superior Court said: "Common carriers do not, in legal contemplation, warrant the absolute safety of passengers in their cars, but they are bound to the exercise of the utmost degree of diligence and care, and it has been held that this duty includes the exertion of such power as conductors and other trainmen have to protect passengers from violence of other persons . . . In a case where these and other analogous cases were considered the rule was stated as follows: 'The conductor has general power and control over the train and all persons on it, with authority to compel observance of the regulations of the company, to preserve order, and to employ the whole force of the train

men, and of passengers willing to assist, for these purposes.' "

The bus driver here could have, if necessary, called to his assistance, police at the various stops he made. But he did none of these things. His fault was not only negative in that he failed to do what he was required to do, but it was positive in that he purposely declined to offer the services the law required. In a deposition he made prior to the trial he indicated that he had an aversion to passengers and did not look at them: "I never look at the passengers; I hate them."

Hatred of those who provide the means for the hater's existence is not, unfortunately, an unusual phenomenon in the history of the human race, but where the evidence is clear in a court of law, that hatred results in injury to an innocent person, the hater cannot expect to be relieved from his legal responsibility on the basis that he is so constituted that he despises those who make his job and salary possible.

In *Mulhause v. St. Ry. Co.*, 201 Pa. 237, the plaintiff lost his foot when he was thrown beneath a streetcar in the surging forward of a crowd of potential passengers. This Court held that the defendant traction company could have anticipated what occurred and could have prevented the tragic accident by properly patrolling the loading space: "It is quite apparent that the plaintiff would not have been injured by an overcrowded car had there been admitted to the station only the number required to fill the car. To permit, however, 150 or 200 persons anxious to return home to go into the enclosure used as a station for entering a car with a seating capacity of forty-five people, at nine o'clock at night, was an invitation to the intending passengers to create a state of affairs that would necessarily result in danger.

"But aside from this means of protecting those at the station, the corporation could have controlled the

crowd and prevented disorder by having a sufficient number of officers present at the station to direct the movements of the people."

The defendant strikes with emphasis the chord of nonresponsibility for rudeness of passengers or intending passengers. While the purchase of a railroad or bus ticket does not make the traveler or gentleman, the seller of the ticket is on notice that if that passenger exhibits rowdyism degenerating into violence, and the carrier has the capacity and the means to pull the fangs of violent behavior and does not do so, and injury results to an innocent person, the carrier cannot escape tortious responsibility for failing to use the forceps of prevention.

In *Kennedy v. Penna. R. R. Co.*, supra, the plaintiff was injured at a railroad station when a group of people, swarming toward a train, knocked her to the ground. The station authorities knew of the presence of a large group of students and a band excitedly prepared to give a football team a noisy, boisterous send-off as it was about to leave on a presumably triumphant gridiron journey. It made no preparations to protect the nonparticipants in this athletic tumultuous pandemonium. The railroad was required to pay for the failure to foresee what was obvious to the most unprophetic onlooker: "If for a considerable time prior to the accident there was a large crowd of students and followers in the station, indulging in such boisterous conduct as manifestly threatened personal injury to passengers, and the defendant could, by the exercise of due vigilance, have ejected this mob or reduced it to order and control, before the plaintiff was injured, then its failure to do so renders it answerable to the plaintiff if she was subsequently injured by a rush of this crowd."

The trial court in the case at bar properly refused judgment n.o.v., but it did a strange thing by ordering

a new trial on the subject of negligence. At the trial the plaintiff sought to introduce evidence that on previous occasions she had complained to the defendant about crowded conditions on its buses. The trial judge excluded this testimony but, after the trial, ruled that it erred in doing so and for that reason ordered a new trial. This was indeed a non sequitur if there ever was one. Since the record amply sustains the jury's conclusion that the defendant was negligent, why is it necessary to repeat the journey of the trial when the vehicle of factual controversy has reached its destination? The trial lists in Philadelphia, which are more crowded, jammed and packed than any bus in the city, do not allow for academic journeys in order to test out what needs no testing.

So far as notice to the defendant was concerned, in this case, the defendant had notice throughout the length of the bus trip. Indeed the court itself noted this in its opinion where it said: "Proof that people crowded on defendant's bus on the day of the accident had been unruly for a period of time prior to wife-plaintiff's attempt to leave the bus."

When the plaintiff endeavored to introduce evidence as to notice of previous conditions, the defendant's counsel objected and the court sustained that objection. It would indeed be an anomaly now that the defendant should receive a new trial based on an error of its own making. Thus, there is no justification for a new trial for the reason given by the trial court.

The plaintiff filed a motion for a new trial on the basis of an inadequate verdict. The lower court did not pass on this motion. The record, therefore, is remanded for consideration of, and a decision on, plaintiff's motion for a new trial on the subject of damages.

Mr. Justice ROBERTS concurs in the result.

Mr. Chief Justice BELL dissents and would enter judgment for the defendant n.o.v.

DISSENTING OPINION BY MR. JUSTICE COHEN:

The trial court issued two orders: (1) denying defendant's motion for judgment n.o.v. and (2) granting a new trial generally. Defendant appealed from the order denying its motion for judgment n.o.v. Neither party appealed from the order granting a new trial. Consequently, this Court is faced with only one issue: Did the court below err in denying defendant's motion for judgment n.o.v.? That is the only question which this case presents for our consideration. Yet, after reaching a determination on that matter, the majority have seen fit to remand the record to the lower court to determine whether the new trial which the lower court had ordered and from which order no appeal had been taken should be a new trial limited to the issue of damages. The absurdity of this Court's decision is highlighted by the fact that if the defendant had not taken its appeal from the order denying the motion for judgment n.o.v., this case, as to any issue, would never have been before us. It is as though my colleagues, through the exercise of their King's Bench powers, would study every radio, television and newspaper account of the decisions of the courts below, as well as the official reports of our trial courts, and then review each and every case without requiring that an appeal be taken. I submit that the majority have in this matter taken the first step toward that ridiculous end.

It has been the policy of this Court that a single appeal may not present for review more than one order, judgment or decree. *Clark v. Clark*, 411 Pa. 251, 191 A. 2d 417 (1963); *Gibson v. Bruner*, 406 Pa. 315, 178 A. 2d 145 (1961); *Frailey Township School District v. Schuylkill Mining Company*, 361 Pa. 557, 64 A. 2d 788 (1949). In *Gibson*, we required appellant to choose which of two adverse judgments entered against her she desired that we review inasmuch as only one appeal had been taken. In that case, appellant intend-

396.

ed to appeal from both adverse judgments and by error or omission failed to do so. In the matter presently before us, no appeal was taken from the order granting a new trial, not because of error or omission, but because neither party intended to take such an appeal. Surely, if this Court will not review an order from which an appeal was erroneously omitted, it should not review an order which the parties were satisfied to leave alone. If we were to review every case in which error occurred but no appeal was taken, we might as well close our Court to displeased litigants who wish to properly pursue their right of appeal.

I dissent.