Clare Immaculata KENNY, Appellant in 77–2489,

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Appellant in No. 77–2490,**

and

**City of Philadelphia.**

Nos. 77–2489, 77–2490.

United States Court of Appeals, Third Circuit.

Argued June 5, 1978.

Decided July 18, 1978.

Edward J. Morris, Joseph V. Cardona, Philadelphia, Pa., for Clare Immaculata Kenny.

Joseph R. Livesey, Kates & Livesey, Philadelphia, Pa., for Southeastern Pa. Transp. Auth.; Lewis H. Van Dusen, Jr., Drinker, Biddle and Reath, Philadelphia, Pa., of counsel.

Before ADAMS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Whether a woman who is raped in the station of the Philadelphia transit system may recover damages from the carrier because of its lack of adequate protection is the issue in this diversity case. We conclude that a showing of deficient lighting on the station platform and insufficient attention to conditions by the only employee on the premises support a jury finding of carrier culpability. Accordingly, we reverse judgment n. o. v. in favor of the transit authority and reinstate the jury verdict.

The young woman plaintiff was awaiting the arrival of a train operated by SEPTA[1] when she was attacked by another patron. She filed suit in the district court charging negligence on the part of the transit authority and the City of Philadelphia. A jury awarded damages of $18,000 against SEPTA alone, but the district court entered judgment n. o. v.

The plaintiff's experience began on October 2, 1975, at about 9:00 P.M., when she purchased a ticket at the ground level cashier's booth at the Fairmont Avenue Station of the high speed Frankford Elevated Line in Philadelphia. She climbed three flights of steps to the elevated platform, sat on a bench near a light and waited for a northbound train. The only other person on the platform, a man on the opposite side of the tracks, crossed over to plaintiff's side and sat on the same bench. After saying a few words, the man dragged the plaintiff some 150 feet to the darkened south end of the platform and then beat and raped her. Her screams apparently alerted an unknown person in the neighborhood who called the police. Responding to a radio call, an officer apprehended the assailant on the platform.

The arresting officer and other policemen who investigated the crime testified that the area at the south end of the platform was dark and that the electric lights there

were not lit. A detective who arrived about an hour after the attack occurred said it was necessary to use a powerful flashlight to illuminate the area in his search for physical evidence.

The SEPTA attendant who had been in the cashier's booth testified that he knew nothing of the attack and had not heard the plaintiff's screams. He admitted he had a portable radio playing in the booth, but said it was permitted by his employer. A telephone in the booth was connected with dispatchers and security units but was not used that evening until after police had come to investigate the incident. No other SEPTA employee was in the station or on the platform at the time the crime was committed.

A SEPTA employee testified that the transit system relied on Philadelphia police to provide protection for its patrons. He read a joint statement issued in 1972 by the Mayor of Philadelphia, the Board Chairman of SEPTA, and other public officials declaring that the occurrence of crime in the SEPTA transit system was intolerable. SEPTA had not taken any additional steps for passenger security after issuance of the joint statement, but as a measure to prevent crime, the city agreed in the statement to assign additional police to the SEPTA system. In 1973, Philadelphia received a grant from the federal government to hire 60 additional policemen after stating in its application that based on data compiled by SEPTA the "reported incidents on the high speed line are increasing, particularly robbery, assault, and rowdism [sic]." At the trial, however, there was testimony that no criminal incidents had been reported at the Fairmont Station in the three years preceding the incident here.

Through its answers to interrogatories, the jury found that SEPTA had knowledge of the dangerous condition of the platform, failed to adequately protect against it, and

1. SEPTA, Southeastern Pennsylvania Transit Authority, is an entity created by the Pennsylvania legislature to provide mass transit in the Greater Philadelphia area. *See* Metropolitan

Transportation Authorities Act of 1963, §§ 2, 4, Pa.Stat.Ann. tit. 66, §§ 2002, 2004 (Cum.Supp. 1978–1979).

this negligence was the proximate cause of plaintiff's injuries. The City of Philadelphia was exonerated.

The district court entered judgment n. o. v. in favor of SEPTA, finding it had no reason to anticipate the criminal conduct of the assailant at this particular station. The court also concluded that the lack of adequate lighting and a system of security devices, such as closed circuit TV coverage, telephones and warning devices, were not proximate causes of the assault upon plaintiff. In an alternative holding, the court denied the defendant's motion for a new trial based on contentions of an excessive verdict, improper admission of testimony on repairs to the lighting system following the attack, and prejudicial wording of the interrogatories.

## I.

### JUDGMENT N.O.V.

■ In this diversity case, we are guided by Pennsylvania law which does not hold the proprietor of a business establishment responsible for injuries to its patrons caused by criminal conduct of a third party unless the possibility or likelihood of criminal activity could reasonably have been foreseen or anticipated. In *Moran v. Valley Forge Drive-In Theater, Inc.,* 431 Pa. 432, 246 A.2d 875 (1968), a patron recovered from a theater for injuries received when rowdy teenagers exploded a firecracker near him. The record revealed previous instances in which firecrackers had been exploded on the premises and the proprietor had taken no steps to warn its customers or curb unruly behavior of youthful visitors. The Pennsylvania Supreme Court cited with approval § 344 of the Restatement (Second) of Torts (1965) which reads:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

Comment *e* notes "it may not be enough for the servants of the public utility to give a warning, which might be sufficient if it were merely a possessor holding its land open to the public for its private business purposes." A utility may be required to take additional steps to control the conduct of third persons or otherwise protect the patron against it.

■ Where the possessor of land may have reason to know that there is a likelihood of conduct on the part of third persons generally which is apt to endanger the safety of patrons, the owner may be under a duty to take precautions against such conduct. The focus of inquiry is not limited to anticipation of criminal conduct by the person who actually caused the harm. The trial court in this case narrowed the ambit of liability by looking to the expectations of SEPTA as they applied to the specific offender at the specific location. The duty to protect its patrons, however, is not determined by whether SEPTA had reasonable ground to expect violence directed toward the plaintiff by the particular assailant, but whether the Authority could reasonably have expected criminal activity from anyone at its station. *See Morgan v. Bucks Associates,* 428 F.Supp. 546 (E.D.Pa.1977); *Ford v. Jeffries,* 474 Pa. 588, 379 A.2d 111 (1977); *Anderson v. Bushong Pontiac Co.,* 404 Pa. 382, 171 A.2d 771 (1961).

■ The record reveals that crime on SEPTA's high speed lines, as well as its other systems, had been on the rise. Although steps had been taken to increase police protection, we cannot say as a matter of law that this was enough to preclude SEPTA's liability. As comment *d* to § 344 indicates, a utility is required to exercise reasonable care to use such means of protection as are available, or to provide such means in advance because of the likelihood that third persons may endanger the safety of patrons.

The presence of adequate lighting is recognized as a discouragement to violent criminal activity, particularly in an area where members of the public may be expected.[2] Traditionally, adequate street lighting has been advocated as an effective means of reducing crimes against the person, such as robbery, assault and rape. SEPTA recognized the value of adequate lighting. In response to an interrogatory inquiring what "security measures are currently in effect," it answered that, in addition to police department measures, "[d]efendant's stations were well-lighted." Indeed, there were light standards placed at adequate intervals along the platform at the Fairmont Station. But having the fixtures in place is not enough. They must be in condition to perform their function, that is, illuminate the area. In this respect, there was a jury question as to whether SEPTA had properly maintained the equipment which it had installed.

█ The plaintiff's testimony, corroborated by the police, was that there was no light in the area where the attack occurred, even though fixtures were there. There was evidence that the light bulbs were missing and that the fixtures were rusted, indicating they had not held bulbs for some time. The jury was entitled to determine that insufficient maintenance by SEPTA was negligence, particularly in view of its knowledge that crime had been increasing in the transit system. If further evidence of the connection between criminal activity and lack of lighting were needed, the fact that the assailant dragged the plaintiff to a darkened area supplied it. Whether inadequate, indeed nonexistent, lighting was a substantial factor in bringing about harm to the plaintiff was a matter for the jury to resolve. See Ford v. Jeffries, supra.

Nor was this the only way in which the jury could have found SEPTA failed to protect the plaintiff. The Authority had one employee on the premises. Perhaps it might not have been feasible to place the cashier's booth where he could observe conditions on the platform or to utilize the area on the ground floor near the ticket booth as a waiting room during the evening hours when the platform would be deserted. Nevertheless, for the company to permit the cashier, the sole employee of the Authority at the station, to play a radio while on duty and thus impair his hearing ability was to reduce the effectiveness of his presence. The location of the ticket booth prevented him from seeing any disturbance on the platform and the radio prevented him from hearing anything. Had the cashier heard the screams, he could have quickly gone to the platform, as well as called for police assistance immediately. Plaintiff's cries were loud enough to be heard by someone in the neighborhood who called the police. The jury might well have found that SEPTA owed the plaintiff at least as much concern. See La Sota v. Philadelphia Transportation Co., 421 Pa. 386, 219 A.2d 296 (1966).

## II.

### SEPTA's MOTION FOR A NEW TRIAL

SEPTA has filed a cross appeal from the district court's dismissal of its motion for a new trial. Among the grounds asserted is that the trial court erred in allowing testimony that new lighting had been installed on the platform a few days after the attack. A SEPTA employee testified that lighting at the stations was checked on a daily basis. He produced records showing that about an hour after the rape one light bulb was replaced at a crossover between the two tracks, and the following night, three bulbs were installed. On the day before the incident, four bulbs had been replaced on the southbound platform.

On cross-examination, plaintiff's counsel elicited the fact that a new fluorescent fixture was installed four days after the attack. Defendant contends that this evidence of subsequent repairs was prejudicial. The trial judge, however, ruled that the testimony was admissible for impeachment

---

2. See, e. g., Picco v. Ford Diner, Inc., 113 N.J. Super.Ct. 465, 274 A.2d 301 (1971); Atamian v. Supermarkets General Corp., 146 N.J.Super.Ct. 149, 369 A.2d 38 (1976).

purposes and also to show the feasibility of precautions. We conclude that the evidence was admissible.

■ As a general rule, evidence of remedial measures taken after the event is not admissible to prove culpable conduct. Fed.R.Evid. 407.[3] The reason for the exclusion is to encourage post-accident repairs or safety precautions in the interest of public safety. *See* Saltzburg & Redden, Federal Rules of Evidence Manual 162 (2d ed. 1977). But when the defendant opens up the issue by claiming that all reasonable care was being exercised at the time, then the plaintiff may attack that contention by showing later repairs which are inconsistent with it. *See* 2 J. Weinstein & N. Berger, Weinstein's Evidence ¶¶ 407[03], [04] (1977).

■ In this case, the evidence did not show that a protective device of a nature not previously utilized was subsequently installed, but rather established the need for replacement of that which had previously been employed. As such, the testimony bore directly on the inference that since the lighting was checked on a daily basis, it was adequate at the time the incident occurred. The installation of a new fixture suggested that more than new light bulbs were necessary to maintain the level of lighting that apparently had once existed at the station. Moreover, the cross-examination tended to cast doubt on the thoroughness of the inspections made by the defendant. Hence, the evidence was admissible.

■ Defendant also argues that the interrogatory submitted to the jury was unduly suggestive of SEPTA's liability. The interrogatory read:

> Was defendant SEPTA negligent? i. e., did SEPTA have knowledge of the dangerous condition of the subway platform at issue here and did it fail to adequately protect against such danger?

While the wording of the interrogatory might well have been more neutral in tone, in this case and on this record we do not find its submission to the jury constituted reversible error. The trial court in its charge clearly instructed the jury to "decide whether it was, in fact, a place of hazard" and twice said that the jury had to be satisfied by a preponderance of the evidence that SEPTA knew "the place where plaintiff was injured was a dangerous one." Moreover, similar language was used in the interrogatory directed toward the potential liability of the city; yet, the jury exonerated it. We do not believe, therefore, that the jury was misled as to matters which it had to decide.

■ Defendant also contends that the verdict was excessive. The trial judge stated that his conscience was not shocked by the amount of the verdict, nor did he believe it was based on prejudice or passion. In considering the agonizing experience which the plaintiff had undergone, her humiliation, mental anguish and emotional distress, we cannot say that the trial court abused its discretion in not ordering a new trial.

Accordingly, the judgment in favor of the defendant in appeal No. 77–2489 will be vacated. In appeal No. 77–2490, the order denying defendant's motion will be affirmed. The verdict in favor of the plaintiff will be reinstated and judgment entered in her favor.

3. Rule 407 states:
Subsequent Remedial Measures
When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.