TOOMBS, Harold T., Appellant,

v.

MANNING, Sylvester, Brown, James, and Southeastern Pennsylvania Transportation Authority.

Nos. 86–1540, 1550.

United States Court of Appeals, Third Circuit.

Argued March 3, 1987.

Rehearing Granted, Panel Opinion Vacated Sept. 2, 1987.

Reargued In Banc Nov. 9, 1987.

Decided Dec. 11, 1987.

Blaise H. Coco, Jr. (argued), Coco, Feiner & Citron, P.C., Philadelphia, Pa., for appellant.

Perry S. Bechtle (argued), LaBrum & Doak, Philadelphia, Pa., for appellees.

Before GIBBONS, Chief Judge, SEITZ, WEIS, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG,

HUTCHINSON, SCIRICA and GARTH *, Circuit Judges.

## OPINION OF THE COURT

GARTH, Senior Circuit Judge:

The primary issue we confront on this appeal is whether the defendant, the Southeastern Pennsylvania Transportation Authority (SEPTA), is a Commonwealth party within the ambit of the sovereign immunity statute enacted by the Pennsylvania General Assembly in 1978. Both the plaintiff, Harold T. Toombs, and the defendants (SEPTA and two of its employees) appeal from a district court judgment of $284,-314.64 in favor of Toombs, 640 F.Supp. 938.

Toombs contends that the district court erred when, in accordance with the 1978 limited immunity statute, it reduced the original jury verdict of $1,000,000 to $250,-000 plus delay damages. The defendants assert that they are fully immune under the sovereign immunity statute, and are therefore entitled to judgment as a matter of law. Moreover, they contend that the assessment of delay damages was improper.

We hold that the district court correctly decided that SEPTA was a "Commonwealth party" within the meaning of the sovereign immunity statute, and that judgment in favor of Toombs was properly molded to reflect the statutory cap. We will remand for the district court to hold a *Craig* [1] hearing on the question of delay damages.

## I.

These appeals arise out of a negligence action brought in January of 1985 by Harold Toombs against SEPTA and two of its employees, Sylvester Manning, a station cashier, and James Brown, a subway trainman. Toombs claimed damages for injuries incurred in an accident while he was waiting for a train on a SEPTA platform.

The accident occurred in the early morning hours of January 8, 1983, when Toombs entered the underground Broad Street and Allegheny Avenue station. While waiting on the subway platform, Toombs was approached by two men who demanded that Toombs give them money. Toombs refused and an argument ensued. At the time the argument began, the three men were out of the defendant Sylvester Manning's line of vision from his cashier's booth. For about ten to twelve minutes, the two men harassed Toombs.

Eventually, Toombs and his two assailants came within the sight of Manning in his booth and Manning asked Toombs whether he was all right. Toombs was standing near the edge of the platform, facing Manning. The two men who were harassing Toombs had their backs to Manning, and Manning could see that one of the men was holding a knife behind his back. When Manning left the booth to see what was happening, one of the men harassing Toombs told Manning that he was going to punch Toombs in the mouth. Manning then quickly returned to the booth to let someone through the turnstile.

Manning chose not to summon the police to resolve the argument. There were three ways in which Manning could have summoned aid: (1) by switching on a light at street level to alert the police; (2) by telephoning the SEPTA dispatcher; (3) or by sounding an alarm on the platform itself. Manning testified at trial that there were several loud arguments each night on the station platform, and that he usually tried to handle them himself. He stated that when he had summoned the police in the past they did not arrive in time. Moreover, he claimed that the argument only became serious as the train pulled into the station, and that by then there was no time to call for help.

---

* Senior Circuit Judge Garth participated because he was a member of the original panel.

1. *Craig v. Magee Memorial Rehabilitation Center,* 512 Pa. 60, 515 A.2d 1350 (1986)(Pennsylvania Supreme Court suspended the mandatory feature of the delay damage rule (Rule 238 of the Pennsylvania Rules of Civil Procedure) and directed that hearings as to delay damages be conducted in accordance with suggested factors).

When Manning returned to his booth, a train, driven by the defendant James Brown, approached the station. Toombs turned to look at the incoming train and the larger of the two men punched him in the face. Toombs, with his hands covering his face, stumbled down into the path of the train. When Brown saw Toombs, he applied the train's brake, and the train stopped in its usual position, but not before it had struck Toombs.

Toombs incurred serious injuries as a result of the accident. He was comatose for several weeks, and spent two months in the hospital. He has been in the hospital for several prolonged periods, primarily for treatment of chronic osteomyelitis of his left tibia. Since the accident, Mr. Toombs has been unable to work.

On May 21, 1986, the jury returned a verdict in favor of Toombs, finding Manning 80% responsible for the accident and Brown 20% responsible for the accident. Two days later the jury found Toombs' damages to be $1,000,000. On May 27, 1986, judgment in that amount was entered.

Following the entry of judgment for $1,000,000, several post-trial motions were filed. SEPTA filed a motion for judgment notwithstanding the verdict, a motion for a new trial, and a motion to amend the judgment. Toombs filed a motion to amend the judgment to include delay damages. On July 29, 1986, the district court denied SEPTA's motions for a new trial and judgment notwithstanding the verdict, but granted its motion to amend the judgment. Toombs' motion to amend the judgment to include delay damages was also granted. As a result, judgment was entered in the amount of $284,314.64—$250,000 representing the maximum damages permitted under the sovereign immunity statute's cap on damages and $34,314.64 representing delay damages.

The memorandum opinion accompanying the district court's rulings on the post-trial motions sets out its reasons for reducing the size of the jury award. First, the district court held that SEPTA was a "Commonwealth party" within the meaning of the Pennsylvania sovereign immunity statute. 42 Pa.Cons.Stat.Ann. §§ 8521–8528 (Purdon 1982). In reaching this conclusion, the district court relied heavily upon *Feingold v. Southeastern Pennsylvania Transportation Authority*, 339 Pa.Super. 15, 488 A.2d 284 (1985) which has since been affirmed by the Pennsylvania Supreme Court. *Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 517 A.2d 1270 (1986).

Second, the district court held that SEPTA, as a Commonwealth party, could be liable only if the facts underlying Toombs' cause of action came within one or more of the eight exceptions found in the sovereign immunity statute. 42 Pa.Cons.Stat.Ann. § 8522 (Purdon 1982). The district court concluded that Toombs' suit fell within one of these exceptions to immunity: the vehicular liability exception. Because a successful plaintiff's damages are capped at $250,000 under the statute, the district court reduced Toombs' damage judgment, and, without holding a hearing, added delay damages under Rule 238 of the Pennsylvania Rules of Civil Procedure.

SEPTA made many of the same arguments in its post-trial motions as it now urges in this appeal.[2] SEPTA also argued that it was immune from any damage judgment because Toombs' action did not come within any of the exceptions to the sovereign immunity statute. The district court rejected all of SEPTA's claims including its argument that delay damages had to be included within the $250,000 cap on damages. These appeals followed.[3]

---

**2.** The district court considered and rejected SEPTA's arguments concerning the charge to the jury and Toombs' past criminal record, the necessity for expert testimony regarding the operating of the subway train, and the proper use of expert testimony regarding Toombs' future earning power. We address these issues *infra*.

**3.** A panel of this court affirmed the district court's judgment by the filing of majority and dissenting opinions on July 17, 1987. Thereafter, Toombs' petition for rehearing was granted, and, on September 2, 1987, the panel opinions were vacated and rehearing by the court *in banc* was granted.

## II.

In this diversity case, we face the difficult task of predicting how the Pennsylvania Supreme Court would view the applicability of the Pennsylvania sovereign immunity statute to SEPTA. Based upon our historical analysis of sovereign immunity in Pennsylvania, as well as SEPTA's statutory history and the recent Pennsylvania Supreme Court decision of *Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 517 A.2d 1270 (1986), we hold that SEPTA is a Commonwealth party within the meaning of the 1978 Pennsylvania sovereign immunity statute.

### A.

The Pennsylvania Supreme Court abolished *governmental* immunity in the 1973 decision *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973). The Court's abrogation of *sovereign* immunity came a few years later in *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978). Following *Mayle*, in September of 1978, the Pennsylvania General Assembly enacted a limited statutory sovereign immunity scheme. Act of Sept. 28, 1978, P.L. 788, No. 152 (codified as amended at 42 Pa.Cons.Stat.Ann. §§ 8521–8528 (Purdon 1982)).

The 1978 Act was repealed in 1980 and reenacted as amended by the Act of October 5, 1980, P.L. 693, No. 142, § 221(*l*). The 1980 Act included a sovereign immunity statute and a statutory governmental immunity scheme for "local agencies," [4] 42 Pa.Cons.Stat.Ann. §§ 8541–8553 [5]—both of which were substantially identical in sub-

stance to the 1978 Acts. These statutes recreated the immunity that state and local entities had enjoyed prior to abrogation of common-law immunity, but allowed the recovery of compensatory damages in certain situations. Because the 1980 amendments reflect no substantive differences from the original 1978 enactments, unless otherwise stated, our references will be to the 1978 Act, as currently codified, throughout this opinion.

The legislature set out the intended scope of the sovereign immunity statute in section one of the 1978 Act:

[I]t is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) *unless otherwise specifically authorized by statute.*

1 Pa.Cons.Stat.Ann. § 2310 (Purdon Supp. 1987)(Act of Sept. 28, 1978, P.L. 788, No. 152, § 1)(emphasis added). Thus the new statute ensured that all claims against the Commonwealth of Pennsylvania would be controlled by one statutory immunity scheme unless particular legislation specifically authorized otherwise.

The "revival" of sovereign immunity by the 1978 legislation brought into question

---

**4.** The governmental immunity scheme was also originally enacted in the autumn of 1978. The Political Subdivisions Tort Claims Act, Act of November 26, 1978, P.L. 1399, 53 Pa.Stat.Ann. §§ 5311.101–5311.803. This Act was repealed by section 333 of the Act of October 5, 1980, P.L. 693, No. 142.

**5.** Our analysis focuses on sovereign immunity, and not governmental immunity. Governmental immunity would pertain only to "local agencies," which would include governmental units other than those of the Commonwealth govern-

ment, including intermediate units. 42 Pa.Cons. Stat.Ann. § 8501 (Purdon 1982). Although both Toombs and SEPTA urge as alternative arguments that SEPTA be deemed a local agency within the meaning of 42 Pa.Cons.Stat.Ann. §§ 8541–8564 (Purdon 1982), our conclusion that SEPTA is a Commonwealth party makes it unnecessary for us to consider governmental, as distinct from sovereign, immunity. Hence, references to governmental immunity are included only in the historical discussion of this opinion.

the validity of earlier enactments which had waived sovereign immunity for certain state entities. Section 4 of the 1978 Act dealt with the problem of existing statutes which waived sovereign immunity in a manner inconsistent with the provisions of the Act. Subsection (a) provided that "[t]he provisions of the following acts, and all other acts and parts of acts, are repealed insofar as they waive or purport to waive sovereign immunity inconsistent with this act, but are saved from repeal insofar as they provide defenses or immunities from suit." Act of Sept. 28, 1978, P.L. 788, No. 152, § 4(a).[6] Subsection (b) of section 4 of the 1978 Act clarified the legislature's intention that any statutory provisions conflicting with the new statutory sovereign immunity scheme were repealed: "Except as provided in subsection (a), all other acts and parts of acts are repealed insofar as they are inconsistent with this act." *Id.* § 4(b).

These portions of the 1978 Act clearly indicate that the new statutory sovereign immunity, as set out in 42 Pa.Cons.Stat. Ann. §§ 8521–8528 (Purdon 1982), was to protect every state agency, even if an agency's sovereign immunity had been previously waived by the state. The result was a statutory scheme which applied uniformly to all state agencies.[7] It provided that liability could be found only if an action fell within one of the eight exceptions set out in the statute: vehicle liabili-

ty; medical-professional liability; care, custody or control of personal property; Commonwealth real estate, highways, and sidewalks; potholes and other dangerous conditions; care, custody or control of animals; liquor store sales; and National Guard activities. *Id.* § 8522(b)(1)–(8).

The 1978 statute extended sovereign immunity to all "Commonwealth parties" defined in the statute as "Commonwealth agenc[ies] and any employee thereof, but only with respect to an act within the scope of his office or employment." *Id.* § 8501. The legislative history for the sovereign immunity statute noted that the term "Commonwealth agency" is defined in 42 Pa.Cons.Stat.Ann. § 102 as "[a]ny executive agency or independent agency." 42 Pa.Cons.Stat.Ann. § 102; *see* General Assembly of the Commonwealth of Pennsylvania, Joint State Government Commission, *Sovereign Immunity* 11 n. 2 (1978) [hereinafter *Sovereign Immunity*]. Section 102 also defines both "executive agency" [8] and "independent agency." [9]

The definition of independent agency is more relevant to our immunity analysis, because the Pennsylvania Turnpike Commission, which was considered non-immune from tort of liability under common law, *see Specter v. Commonwealth*, 462 Pa. 474, 341 A.2d 481 (1975), is now included within the definition as an independent agency within the protection of the 1978 immunity statute. Indeed, the legislative

---

**6.** Section 4(a) specifically repeals the waiver of sovereign immunity provisions of four acts, none of which are relevant to the question facing us: "State Council of Civil Defense Act", the "Pennsylvania Human Relations Act," the "Mental Health and Mental Retardation Act of 1966," the "Health Care Services Malpractice Act," "The Child Protective Service Law," and the "Mental Health Procedures Act." To the extent that the provisions of these statutes were inconsistent with the sovereign immunity statute, they were repealed.

**7.** Section 5 of the 1978 Act states that the act should be interpreted to "assure the development of a consistent body of law, an orderly and uniform management of litigation and to prevent inequities within the terms of this act that would otherwise be caused by the lack of identical restrictions, limitations, procedural requirements and the application of the other

provisions of this act ..." Act of Sept. 28, 1978, P.L. 788, No. 152, § 5(b).

**8.** "Executive agency" is defined as "[t]he Governor and the departments, boards, commissions, authorities and other officers and agencies of the Commonwealth government, but the term does not include any court or other officer or agency of the unified judicial system, the General Assembly and its officers and agencies, or any independent agency." 42 Pa.Cons.Stat.Ann. § 102 (Purdon 1982).

**9.** "Independent agency" is defined as "Boards, commissions, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy supervision and control of the Governor, but the term does not include any court or other officer or agency of the unified judicial system or the General Assembly and its officers and agencies...." *Id.*

history for the 1978 Act specifically noted that the Pennsylvania Turnpike Commission is an "independent agency" within the meaning of the statute. *Sovereign Immunity, supra,* at 11 n. 2.

The significance to our analysis of the legislature's inclusion of the Pennsylvania Turnpike Commission as an immune agency is that it is clear that the General Assembly intended to provide sovereign immunity protection not only for those entities which before *Mayle* had been immune as sovereigns, but also for those entities not previously immune, but which now came within the statute's scope.[10]

Nothing in the 1978 Act's legislative history indicates that previously non-immune entities (such as SEPTA) were not to be covered by the immunity provided by the 1978 legislation. Indeed, the attempt by Chief Judge Gibbons in dissent to argue otherwise, by referring to Pennsylvania Governor Shapp's September 28, 1978 statement when the Governor approved the

1978 legislation, is unavailing. (See dissent at p. 471).

In reproducing Governor Shapp's statement, the dissent has deleted a significant portion thus changing the entire meaning of that statement. The deleted portion *not included* by the dissent reads:

> ... if suit is instituted within the appropriate statute of limitations or within 60 days after the effective date of this act, whichever first occurs.

The *full* statement made by Governor Shapp discloses clearly that the Governor was not referring to a distinction between formerly immune and formerly non-immune entities. Rather, the statement *in context* reveals that § 5 of the Act was designed, and was understood by the Governor, to provide a grace period for causes of action that had not, but could have been, brought prior to the passage of the Act, but which were barred by the passage of the Act. The underlined portions of the Governor's statement which follow, provide ample proof that the dissent's interpreta-

---

**10.** Those who argue that the legislature intended to provide sovereign immunity only for those entities which had been immune as sovereigns before *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978), rely in large part on the remarks made by Representative Berson on September 12, 1978, which are reported in the Legislative Journal—House at page 2794. Representative Berson stated, "[i]n effect, what we are doing is attempting to overrule *Mayle.*" Those remarks, however, were made in the context of a discussion of a proposed amendment to the sovereign immunity bill directed solely to the subject of retroactivity. The amendment, (which became § 5(b) of the Statute) was a retroactivity provision designed to prohibit the bringing of any new cause of action which may have been created as a result of the *Mayle* decision and which may have arisen between the time of *Mayle* (July 14, 1978) and the time of the enactment of the statute (September 28, 1978). Thus, the purpose of Section 5 was indeed to overrule *Mayle* but only for that very limited purpose. Accordingly, Representative Berson's remarks cannot be interpreted as a discussion relating to the entire bill.

The bill was introduced as a result of the Joint State Commission on Sovereign Immunity report. Both the publication of this report (May 22, 1978) and the introduction of the bill to the full House of Representatives (June 5, 1978) preceded the *Mayle* decision of July 14, 1978. As a result of *Mayle,* the bill was amended on September 12, 1978 giving rise to Representative

Berson's statement concerning the *Mayle* decision. On September 28, 1978, the bill was enacted into law and re-enacted as amended on October 5, 1980. As stated in text *supra,* (p. 457), the 1980 amendment made no substantive changes to the 1978 Act which are relevant here. Thus, although *Mayle* certainly may have accelerated the process, it was not the sole motivating force behind the enactment of the sovereign immunity statute.

The legislative history also suggests that the sovereign immunity called for in the 1978 Act was meant to apply to *all* claims against the Commonwealth except those expressly excluded by the statute itself. As the Joint State Commission stated:

> The intention [of the proposed legislation] is to prohibit the creation of any new causes of action and merely remove the bar from suit where the cause of action already exists in the [8] enumerated areas.

*Report of the Joint State Government Commission on Sovereign Immunity* 11 (1978).

In discussing the meaning of § 8522(a) of the 1978 legislation, the Commission made clear that the waiver of sovereign immunity was meant to be contained in the eight areas in which the legislature had expressly waived sovereign immunity. There was no intention to allow pre–1978 waivers—created either by statute or caselaw—to continue in effect after the 1978 legislation.

tion of the statement, and thus its argument made in reliance on that statement, is flawed. The relevant complete portion of the Governor's statement reads as follows:

It is my intention in approving this act that section 5 (construction and application) shall have general retroactive effect; and in particular it is the specific intent that:

... (2) In all cases where the cause of action is not permitted by section 5110, regardless of when it arose, the cause of action shall be barred and sovereign immunity shall continue as a defense: *Provided, That an action that would not have been barred by the applicable statutory or decisional law as it existed on July 13, 1978, shall not be barred if suit is instituted within the appropriate statute of limitations or within 60 days after the effective date of this act, whichever first occurs.*

Governor's Message in Approving Act of September 28, 1978, Pub.L. 788, No. 152 (emphasis added).

Thus, when considered *in full context,* Governor Shapp's statement does not support the dissent's thesis that the 1978 Act provided no immunity for SEPTA.

### B.

Commonwealth parties are subject to suit if the actions charging them with liability fall within one or more of the eight exceptions listed in 42 Pa.Cons.Stat.Ann. § 8522(b). Any recovery under these exceptions is limited by a cap on damages. The damage limitation for Commonwealth parties provides that "[d]amages arising from the same cause of action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $250,000 in favor of any plaintiff or $1,000,000 in the aggregate." 42 Pa.Cons.Stat.Ann. § 8528(b) (Purdon 1982).[11]

---

11. The corresponding provision for local agencies limits damages to $500,000 in the aggregate.

### III.

The question thus arises: is SEPTA a "Commonwealth party?" We can look to many sources, but the logical place to start is the statute which created SEPTA.

SEPTA is a regional transportation authority serving five communities in the Philadelphia metropolitan area. It was created by the Pennsylvania General Assembly under the Metropolitan Transportation Authorities Act of 1963 for the purpose of improving the existing uncoordinated and inefficient mass transportation system. Act of August 14, 1963, P.L. 984, No. 450 (codified as amended at 66 Pa.Stat.Ann. §§ 2001–2043 (Purdon Supp. 1975)(repealed 1980)), *reenacted and codified at* 55 Pa. Stat.Ann. §§ 600.301–.407. (Purdon Supp. 1987). SEPTA currently operates under the Pennsylvania Urban Mass Transportation Law. 55 Pa.Stat.Ann. § 600.301–.407. (Purdon Supp.1987). Section 600.303 of the Urban Mass Transportation Law provides for the creation of the transportation authorities and their rights and powers:

There is hereby authorized the creation of a separate body corporate and politic in each metropolitan area, to be known as the transportation authority of such area, extending to and including all of the territory in the metropolitan area. *An authority shall in no way be deemed an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.*

*Id.* § 600.303(a)(emphasis added). The transportation authorities were given, among other powers, the power of eminent domain, *id.* § 600.303(d)(15), and the power to "act as agent[s] of the State, or of the Federal Government or any of its instrumentalities or agencies, for the public purpose set out in [the Act]." *Id.* § 600.303(d)(25). These provisions seemingly cloak SEPTA with some form of sovereign power, but there are also provisions

*Id.* § 8553(b).

in the enabling act which indicate that SEPTA was subject to suit, as any private corporation would be.

Specifically, the above-quoted section, which sets out the rights and powers of the transportation authorities, provides that they have the power "[t]o sue and be sued, implead and be impleaded, complain and defend in all courts...." *Id.* § 600.303(d)(2). Moreover, the statute provides for the creation of a damage reserve fund:

> The board shall withdraw from the gross receipts of the authority and charge to operating expenses such an amount of money as, in the opinion of the board, shall be sufficient to provide for the adjustment, defense and satisfaction of all suits, claims, demands, rights and causes of action, and the payment and satisfaction of all judgments entered against the authority for damage caused by injury to or death of any person and for damage to property resulting from the construction, maintenance, and operation of the transportation system, and the board shall deposit such moneys in a fund to be known and designated as damage reserve fund....

Act of August 14, 1963, P.L. 984, No. 450, § 34 (codified as amended at 66 Pa.Cons. Stat.Ann. § 2034 (Purdon Supp.1975) (repealed 1980)), *reenacted at* 55 Pa.Stat.Ann. § 600.338.

These provisions apparently anticipated the transportation authorities' defense of tort actions. It would thus appear that whatever the status of SEPTA under its 1963 enabling act insofar as immunity was concerned, immunity was waived when the legislature provided that SEPTA could be sued and was to establish a damage fund reserve to respond to such actions.[12]

### A.

To answer the question we asked earlier —whether SEPTA is a "Commonwealth party"—we must analyze—and analogize from—the existing case law, and supplement our analysis with an understanding of the sovereign immunity statute and SEPTA's enabling act.

We are not without guidance in this endeavor. That guidance has recently been furnished by the Pennsylvania Supreme Court in the case of *Feingold v. Southeastern Transportation Authority*, 512 Pa. 567, 517 A.2d 1270 (1986). The district court did not have the benefit of the Pennsylvania Supreme Court decision in *Feingold*, which was not filed until four months after its July 1986 amendment of Toombs' judgment. Accordingly, the district court relied upon the Superior Court *Feingold* decision in reaching its conclusion that SEPTA is a Commonwealth party protected by the $250,000 cap on damages. It was only after the submission of briefs in this appeal, on November 18, 1986, that the Superior Court decision was affirmed by the Pennsylvania Supreme Court.

The *Feingold* case involved an automobile accident between Feingold and a SEP-

12. The conclusion that SEPTA's enabling statute waived its immunity is borne out by the judgments awarded against SEPTA prior to the abrogation of sovereign immunity by *Mayle* and the promulgation of the 1978 sovereign immunity statute. *See, e.g., Lebesco v. Southeastern Pennsylvania Transportation on Authority*, 251 Pa.Super. 415, 380 A.2d 848 (1977); *Ottaviano v. Southeastern Pennsylvania Transportation Authority*, 239 Pa.Super. 363, 361 A.2d 810 (1976); *Wright v. Southeastern Pennsylvania Transportation Authority*, 239 Pa.Super. 165, 361 A.2d 389 (1976). All these cases were decided prior to *Mayle* before common-law sovereign immunity was abrogated.

*Reilly v. Southeastern Pennsylvania Transportation Authority*, 507 Pa. 204, 489 A.2d 1291 (1985) is additional support for our conclusion that SEPTA had waived its immunity—an immunity restored by the 1978 Act. In *Reilly*, the Pennsylvania Supreme Court affirmed a tort award of $2,000,000 against SEPTA. The question of the applicability of the immunity statutes to SEPTA was not discussed in the Pennsylvania Supreme Court's opinion. The cause of action accrued in *Reilly* on February 20, 1978, before *Mayle* was decided in July 1978 and the enactment of the immunity statutes in September 1978. The 1978 statute has been held not to apply to causes of action accruing before the September 28, 1978 enactment. *Gibson v. Commonwealth*, 490 Pa. 156, 415 A.2d 80 (1980). Thus, Reilly's award, which was based upon a cause of action which accrued prior to the 1978 Act and which was affirmed by the Pennsylvania Supreme Court in 1985, was not subject to the cap provisions of that Act.

TA bus which occurred in September of 1974. SEPTA did not contest liability, and the case went to trial on the issue of damages. The complaint, originally filed in May of 1975, was amended in March of 1976 to include a count for punitive damages. The *Feingold* trial court permitted the imposition of punitive damages against SEPTA, but the Superior Court reversed that portion of the trial court's order. The Pennsylvania Supreme Court affirmed the Superior Court on the punitive damages issue, and held that it was inappropriate to assess punitive damages against SEPTA, a Commonwealth agency, in a tort action.

*Feingold* arose before the effective date of the 1978 sovereign immunity statute.[13] Thus a Commonwealth agency which had common law immunity from both compensatory and punitive damages prior to *Mayle* (even though, as we earlier observed, SEPTA's enabling Act had waived immunity from damages (*see supra* p. 461)) was held under *Feingold* to retain immunity only from punitive damages after *Mayle*. While *Feingold* did not deal directly with the question of SEPTA's status under the immunity statute, the court's analysis recognized the fact that SEPTA as a Commonwealth agency, was no longer protected by common-law sovereign immunity against *compensatory damages*. See *Feingold*, 517 A.2d at 1276 n. 8, 1276–77.

The Pennsylvania Supreme Court conducted a two part analysis in *Feingold*. First, it determined that SEPTA was a Commonwealth agency, and while remanding for a new trial on other grounds, nevertheless noted that compensatory damages under the 1978 Act were authorized. It then assessed the policy arguments for exempting public agencies from punitive damages.

In the first phase of its analysis, the court examined SEPTA's statutory under-

pinnings, citing some of the same provisions to which we have made reference in this opinion. In addition, it cited with approval, and quoted at length, our case of *Crilly v. Southeastern Pennsylvania Transportation Authority*, 529 F.2d 1355 (3d Cir.1976). In *Crilly* we held that SEPTA was a political subdivision of the Commonwealth and as such was exempt under the Wagner and Taft–Hartley Acts. The Pennsylvania Supreme Court quoted *Crilly*'s statement that "SEPTA was created by an act of the state legislature as an 'agency and instrumentality' of the Commonwealth to 'exercise ... public powers,' including that of eminent domain." *Feingold*, 517 A.2d at 1275–76, *quoting Crilly*, 529 F.2d at 1358. After considering these factors, the Pennsylvania Supreme Court stated it had "no hesitation in concluding that SEPTA was intended to be considered an agency of the Commonwealth." *Feingold*, 517 A.2d at 1276.

The Pennsylvania Supreme Court went on to consider whether it was appropriate to assess punitive damages against an agency of the Commonwealth. It noted that "[t]raditionally, government agencies have been exempt from the imposition of punitive damages. *See Hermits of St. Augustine v. County of Philadelphia*, 4 Clark 120, 7 Pa. L.J. 124 (1847)." *Id.* Focusing on the "historical perspective" of exempting public agencies, the court then quoted at length from the Supreme Court decision in *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), which addressed the immunity of municipalities from punitive damages. *Id.*

Most important to our analysis, the court highlighted a crucial factor in its decision:

Since the abolition of the common law doctrine of sovereign immunity, victims may now recover compensatory damages

---

13. *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978) was handed down on July 14, 1978. The Pennsylvania Supreme Court in *Gibson v. Commonwealth*, 490 Pa. 156, 415 A.2d 80 (1980) held, among other things, that actions against the Commonwealth which had accrued prior to *Mayle*'s abrogation of sovereign immunity were nonetheless actionable.

The sovereign immunity statute was promulgated on September 28, 1978. The Act itself contained retroactivity language, but the Pennsylvania Supreme Court held, also in Gibson, 490 Pa. at 158, 415 A.2d at 81, that the 1978 Act could not constitutionally govern actions which accrued before the effective date of the statute.

for injuries negligently caused by the Commonwealth and its agents. *See Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978), 42 Pa.C.S. § 8501 *et seq.*[8] [the 1978 sovereign immunity statute]. Thus, we are not here faced with a situation where the person who has been injured will be left without recourse.

*Id.* 517 A.2d at 1276–77. Even more relevant to our inquiry is the footnote signalled in the above quotation from *Feingold:*

> 8 Appellant attempts to argue that our erosion of the sovereign immunity doctrine as exemplified in *Mayle* can be extended to punitive damages. The only damages which are permitted against the Commonwealth, *either by order of this Court or by statute,* are those that are compensatory in nature. *See also* 1 Pa. S.C. § 2310; 42 Pa.C.S. § 8522.

*Id.* 517 A.2d at 1276 n. 8 (emphasis added). The Supreme Court concluded "that it would be inappropriate to assess punitive damages against SEPTA given its status as a Commonwealth agency." *Id.* 517 A.2d at 1277.

We are satisfied that the Pennsylvania Supreme Court's holding in *Feingold* dictates our conclusion. At first glance, the holding that SEPTA as a Commonwealth agency is immune from punitive damages seems analytically distinct from our holding that SEPTA is a Commonwealth party within the meaning of the sovereign immunity statute. It is not.

The concepts of sovereign immunity and immunity from punitive damages arise from the same theoretical and historical underpinnings: the desire to protect the government treasury and the concept that "the King can do no wrong." Indeed, as Justice Larsen of the Pennsylvania Supreme Court noted in his dissent in *Feingold,* "[t]he 'tradition' prohibiting punitive

damages ... [is] largely a by-product of the antiquated doctrine of sovereign immunity ..." *Feingold,* 517 A.2d at 1278 (Larsen, J., dissenting). If a party is protected from suit by sovereign immunity, then it is immune from both compensatory and punitive damages. A party who waives that immunity, or is subject to judicial abrogation of that immunity, *may* be liable for compensatory damages and/or punitive damages, as any private individual would. However, as the Pennsylvania Supreme Court has now held in *Feingold,* there are persuasive justifications for retaining immunity from punitive damages where the tortfeasor is a party, such as SEPTA, which shares Commonwealth status.

The only reason punitive damages may not be assessed against such a tortfeasor is because of the unique status—Commonwealth agency status—that the tortfeasor holds. Thus SEPTA shares the immunity from punitive damages that other Commonwealth parties have only because it is a Commonwealth party within the meaning of the statute cited in the *Feingold* opinion. Thus it cannot be said that, because the *Feingold* court dealt only with the subject of punitive damages, its holding does not bear on the issue of SEPTA's status as a Commonwealth party protected by the 1978 sovereign immunity statute.

Consequently, since the Pennsylvania Supreme Court has defined SEPTA as a Commonwealth agency, and the 1978 sovereign immunity statutes were intended to protect such agencies which "lost" their common law immunity after *Mayle,* we conclude that SEPTA is a "Commonwealth agency" within the meaning of the statute. 1 Pa. Cons.Stat.Ann. § 2310 (Purdon Supp.1987). 42 Pa.Cons.Stat.Ann. §§ 8521–8528 (Purdon 1982).[14] Therefore, SEPTA is immune from compensatory damage claims above

---

**14.** It has been argued that the statutory creation and continued existence of a damage reserve fund for those injured by SEPTA's negligence indicates that the Pennsylvania Legislature did not intend to revive SEPTA's sovereign immunity. In addition to the other reasons we have discussed for concluding that SEPTA comes within the coverage of the 1978 legislation, we

find this argument to be particularly unpersuasive because it fails to take into account the fact that SEPTA, though cloaked in immunity, remains liable for damages up to $250,000 per person and up to $1,000,000 in the aggregate. *See* 42 Pa.Cons.Stat.Ann. § 8528(b) (Purdon 1982).

the $250,000 cap which the statute provides.

### B.

Toombs contends that *Feingold* is not determinative of the question of SEPTA's status under the 1978 immunity statute, and that other Pennsylvania cases indicate that SEPTA is a "quasi-governmental" entity, or, at most, a "local agency" within the meaning of the statute. The cases cited by Toombs do not shed any additional light on the issue, and indeed reinforce our conclusion that SEPTA is a "Commonwealth party."

We recognize that several of the cases, dealing solely with jurisdictional statutes, hold that SEPTA is a "local" entity for purposes of the subject matter jurisdiction of the Pennsylvania Commonwealth Court. *See Scott v. Shapiro*, 19 Pa.Commw. 479, 339 A.2d 597 (1975)(SEPTA is not a state agency within the meaning of the jurisdictional provisions of the Pennsylvania Sunshine Law, Act of July 19, 1974, P.L. 486, No. 175 (codified as amended at 65 Pa.Stat. Ann. §§ 261–269) (repealed Act of July 3, 1986, P.L. 388, No. 84, § 17)); *Southeastern Pennsylvania Transportation Authority v. Kohn*, 18 Pa.Commw. 546, 336 A.2d 904 (1975) (SEPTA not a state agency within the original jurisdiction of the Commonwealth Court, but SEPTA and other transportation authorities are "independent agencies of the Commonwealth and part of its sovereignty" for other purposes); *see also Fisher v. Southeastern Pennsylvania Transportation Authority*, 60 Pa.Commw. 269, 431 A.2d 394 (1981)(SEPTA employees not employees of the Commonwealth of Pennsylvania under a 1935 state statute providing compensation for employees on active duty in the military reserves). However, none of these cases are helpful in resolving the issue of SEPTA's immunity under the 1978 Act.

Moreover, all of these authorities recognize that transportation authorities are tax-exempt because of their status as state agencies. *See Commonwealth v. Erie Metropolitan Transit Authority*, 444 Pa. 345, 281 A.2d 882 (1971)(Erie Metropolitan Transportation Authority is an independent agency of Commonwealth and part of its sovereignty, and therefore exempt from fuel tax); *Southeastern Pennsylvania Transportation Authority v. Pennsylvania*, 41 Pa.Commw. 218, 398 A.2d 770 (1979)(SEPTA exempt from assessment for Workmen's Compensation Administration Fund); *Southeastern Pennsylvania Transportation Authority v. Board for the Assessment and Revision of Taxes in Delaware County*, 13 Pa.Commw. 207, 319 A.2d 10 (1974)(local governments have no authority to levy taxes on SEPTA); *Philadelphia v. Southeastern Pennsylvania Transportation Authority*, 8 Pa.Commw. 280, 303 A.2d 247 (1973)(SEPTA, an instrumentality of the Commonwealth, is not subject to taxation by municipality).

In the same vein, the Pennsylvania Commonwealth Court addressed SEPTA's status under 42 Pa.Cons.Stat.Ann. § 5522(a)(1)(Purdon 1981) in *Graffigna v. Philadelphia*, 98 Pa.Commw. 624, 512 A.2d 91 (1986). That statute requires that an injured party give written notice to any "government unit" which he intends to sue, and, if the "government unit" is a Commonwealth agency, written notice must also be given to the Pennsylvania Attorney General. The party in *Graffigna* had failed to give notice to either SEPTA or the Attorney General. Noting that it had previously expressed the view in *Scott v. Shapiro*, 19 Pa.Commw. 479, 339 A.2d 597 (1975) that "SEPTA's activities had local, rather than statewide scope," *Graffigna*, 512 A.2d at 93, the Commonwealth Court held that SEPTA came within the statute and therefore the lack of notice was fatal to the plaintiff's action. The court did not, however, hold that SEPTA was not a Commonwealth agency; it stated only that it "qualified as a local authority" for purposes of 42 Pa.Cons.Stat.Ann. § 5522. *Id.*

Thus, Toombs' reliance on the cases cited in his brief is misplaced. These cases do no more than highlight the point that SEPTA's status must be determined in light of the purposes of the statute at hand. Of greater import is the fact that each of the cases were decided prior to the Pennsylva-

nia Supreme Court's decision in *Feingold.* While the statutory analyses undertaken in these cases have come to conflicting conclusions about SEPTA's status as a state agency for the purposes of the particular statutes there in question, a common thread among these cases indicates a concern for SEPTA's financial health. SEPTA's funds come from various sources, including annual appropriations from the state. 55 Pa.Stat.Ann. § 600.204 (Purdon Supp.1987). Thus holding that SEPTA is a "Commonwealth party" protected by the sovereign immunity statute comports with the legislature's desire, as evidenced by the promulgation of the 1978 statute, to protect the state treasury.

We think these cases indicate that SEPTA's status must be examined and evaluated under each statute in the context in which the case arises. Consequently, we are not persuaded by Toombs' argument that the cases which he has called to our attention require the conclusion that SEPTA is not a "Commonwealth party" within the meaning of the limited immunity statute.

### C.

On the basis of the preceding analysis, and particularly by reason of the Pennsylvania Supreme Court's latest pronouncement in *Feingold* that SEPTA is a Commonwealth agency against whom punitive damages may not be recovered, we conclude that SEPTA's liability is controlled by the sovereign immunity statute which caps liability of Commonwealth parties. Therefore, if Toombs' cause of action falls within at least one of the eight exceptions, the judgment in favor of Toombs was appropriately capped at $250,000 plus delay damages.

### IV.

We turn to a consideration as to whether the acts underlying Toombs' cause of action are encompassed within any of the exceptions contained in 42 Pa.Cons.Stat. Ann. § 8522 (Purdon 1982). That statute sets out eight exceptions [15] within which the General Assembly has waived "sovereign immunity as a bar to an action against Commonwealth parties." If no exception applies then no recovery whatsoever is available against SEPTA. However, a plaintiff whose cause of action falls within one of the eight exceptions may recover "for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity." 42 Pa. Cons.Stat.Ann. § 8522(a).[16]

There are only two exceptions which could be applicable in this case: the vehicular liability exception and the Commonwealth real estate, highways, and sidewalks exception. Subsection (b) of section 8522 reads in relevant part:

(b) Acts which may impose liability. The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:

(1) *Vehicle liability.*—The operation of any motor vehicle in the possession or control of a Commonwealth party. As used in this paragraph, "motor vehicle" means any vehicle which is self-propelled and any attachment thereto, including vehicles operated by rail, through water or in the air.

\* \* \* \*

(4) *Commonwealth real estate, highways, and sidewalks.*—A dangerous con-

---

**15.** Section 8522 has been recently amended to provide a ninth exception for the administration, manufacture, and use of a toxoid or vaccine under certain conditions. 42 Pa.Cons.Stat. Ann. § 8522(b)(9) (Purdon Supp.1987). This exception was not in effect at the time of Toombs' accident.

**16.** The legislative history report for the 1978 Act specifies that the intention behind the clause "is to prohibit the creation of any new causes of action and merely to remove the bar from suit where the cause of action already exists in the enumerated areas." General Assembly of the Commonwealth of Pennsylvania, Joint State Government Commission, *Sovereign Immunity* 11 (1978).

dition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency, except conditions described in paragraph (5) [concerning potholes and other dangerous conditions].

*Id.* § 8522.[17]

The district court rejected the applicability of the real estate exception, and held that the acts underlying Toombs' action fell within the vehicular liability exception of the statute. We agree.

SEPTA argues three relevant points on its appeal of this portion of the district court's decision. Its first argument is that the district court erred by holding SEPTA to a standard of care higher than that of a private individual. Second, SEPTA asserts that Toombs' claim is that SEPTA failed to protect him from the criminal conduct of third parties on the station platform, and that the "SEPTA has no duty to prevent criminal conduct." Finally, SEPTA contends that the vehicular liability exception, by its terms, does not encompass events occurring on the subway platform.

### A.

We can dispose of the first argument in short order. Section 8522 unequivocally provides that sovereign immunity is waived by the state in cases in which the Commonwealth party would be found liable under common law. The statute does not alter the common law liability of common carriers. Under Pennsylvania common law, "[t]here is no dispute that appellant SEPTA is a common carrier and therefore held to the highest degree of care." *Mangini v. Southeastern Pennsylvania Transportation Authority*, 235 Pa.Super. 478, 481, 344 A.2d 621, 623 (1975). Consequently, we must assess the actions of SEPTA

and its employees in light of the traditional duty of care placed upon common carriers, not, as SEPTA claims, under the lesser standard appropriate for private individuals.

### B.

As to SEPTA's characterization of Toombs' action as seeking the recognition of an absolute duty to prevent criminal conduct, or "control criminals," we think that SEPTA has misconstrued Toombs' claim. Toombs is not claiming that SEPTA is responsible for the criminal conduct of third parties. Nor does he claim that SEPTA must guarantee protection of its passengers from such conduct. Rather, Toombs contends that SEPTA and its employees must protect its passengers to the extent possible. Toombs' claim focuses, not on the fact that the criminal conduct occurred, but rather on the reaction of SEPTA employees to such conduct. Therefore, the negligent behavior of the station cashier and the trainman is at issue, not the criminal conduct of the two assailants.

The extent of a common carrier's duty to protect its passengers is well-settled: "A public carrier is not an insurer of its passengers' safety, but liability is imposed for injuries resulting from negligent conduct on the part of the carrier." *Mangini*, 235 Pa.Super. at 481–82, 344 A.2d at 623, *citing Sykes v. Southeastern Pennsylvania Transportation Authority*, 225 Pa.Super. 69, 310 A.2d 277 (1973). In this case, Manning was under a duty to attempt to protect Toombs after he realized the dangerousness of the situation:

In the case where a third person, whether a passenger or otherwise, acts in a violent, criminal or negligent manner, the carrier has a duty to protect the other passengers from his misbehavior to the degree possible.... If necessary, the employees of a carrier may enlist the assistance of willing passengers, police, or other authorities to quell a distur-

---

**17.** The six other exceptions waive sovereign immunity in situations concerning medical-professional liability; the care, custody, or control of personal property; potholes and other danger- ous conditions; the care, custody, and control of animals; liquor store sales; and National Guard activities.

bance.... When these measures are not employed and a passenger is injured, the carrier is liable if prior to the injury the conduct of the offending parties indicated a disposition to engage in violent, harmful behavior, giving rise to a reasonable apprehension of injury to other parties.

*Mangini*, 235 Pa.Super. at 482, 344 A.2d at 623 (citations omitted).

While a common carrier's duty of care clearly does include the duty to protect passengers from the criminal conduct of third parties, most of the cases dealing with this duty have involved instances of criminal conduct which have occurred *in* vehicles. *See, e.g., id.* (SEPTA bus driver found negligent when a group of boys boarded a bus and attacked the passengers); *LaSota v. Philadelphia Transportation Co.,* 421 Pa. 386, 219 A.2d 296 (1966)(breach of duty of common carrier when a bus driver failed to control unruly passengers on a crowded bus and one passenger injured while attempting to disembark); *Gerlach v. Pittsburgh Railways Co.,* 94 Pa.Super. 121 (1928) (carrier found liable for injuries incurred when injured passengers attacked by other passengers, when the belligerence of the attackers should have been apparent to the driver and he took no steps to protect the other passengers).

SEPTA argues that any common law duty which it may have as a carrier does not extend to incidents on the train platform, and that to recognize such a duty is to ask the carrier to "control criminals." It is settled in Pennsylvania, however, that a common carrier has the duty to ensure a passenger's safe ingress into and egress from its vehicles, as well as ensuring a safe journey while the passenger is in the vehicle:

While a carrier is not bound to anticipate unusual and unexpected perils to its passengers, either in transit or while entering or leaving its cars, yet its servants must be diligent at all times in protecting passengers from danger by the exercise of the highest degree of care which is reasonably practicable. It was the duty

of the defendant, as a carrier of passengers for hire, not only to transport the plaintiff safely, but to provide reasonably safe means of ingress and egress to and from the car.

*Mack v. Pittsburgh Rys. Co.,* 247 Pa. 598, 602, 93 A. 618, 619 (1915).

Moreover, the duty of care extends to all of the common carrier's premises: "from the time a passenger leaves the public highway and enters the premises, occupied by a carrier, until he leaves the carrier's premises, for the public highway, the carrier is bound to provide safe means of passage between the public highway and the carrier's means of transportation." *Calhoon v. Pittsburgh Coal Co.,* 128 Pa.Super 582, 589, 194 A. 768, 771 (1937); *see also Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 489 A.2d 1291 (1985)(court held that there was sufficient evidence to find that a bus driver was negligent when he motioned a passenger to pass in front of the bus on a busy street into the path of an oncoming vehicle); *Tyler v. Insurance Co. of North America,* 311 Pa.Super 25, 31, 457 A.2d 95, 98 (1983)("The bus company had a duty, not only to carry [the plaintiff] safely, but to afford her an opportunity to alight safely.")

Therefore, contrary to SEPTA's claim, a common carrier's duty of care does not magically materialize at the train door nor does it immediately dissipate upon a passenger's disembarkation from a bus. A common carrier has the duty to ensure a passenger's safe ingress into and egress from its vehicles. SEPTA is responsible for the reasonable maintenance of its stations, as well as an employee's negligent failure to protect passengers from clear danger while waiting for a train. A carrier and its employees may not behave negligently in the carrier's station and not be held accountable. Consequently, we reject SEPTA's argument and hold that both Brown and Manning's negligent behavior (as found by the jury) breached their common law duty of care.

### C.

SEPTA's final argument—that the wording of the vehicular liability exception

in the statute does not cover this incident— is equally unpersuasive. Basically, SEPTA argues that the wording of the statutory exception, which refers to the "operation of a motor vehicle," limits the waiver of immunity to events which actually occur in the vehicle itself. We disagree.

■ We are satisfied that the actions of Manning, who was found 80% liable by the jury for failing to protect Toombs, and the actions of Brown, as the train engineer, have a substantial nexus to the operation of the vehicle itself. The operation of a SEPTA vehicle cannot be divorced from the purposes of the vehicle's operation. SEPTA operates its trains for the sole purpose of carrying passengers such as Toombs. An essential aspect of such carriage must necessarily include the boarding from, and discharge of passengers onto, SEPTA's platform. In this case, it is undisputed that Toombs was waiting on a SEPTA platform to board a SEPTA train. It is obvious to us that the "operation" of SEPTA's trains must include, therefore, ingress to and egress from SEPTA's vehicles. This being so, passengers waiting to board a SEPTA train, as Toombs was waiting, who suffer injuries by reason of SEPTA's negligence, come within the vehicular liability exception to the statute. If it were otherwise, a Commonwealth carrier would be insulated from its own negligence which involved a passenger's entrance into the carrier's vehicle.[18]

We hold that the vehicular liability exception of section 8522 encompasses the negligent behavior of both Manning, the station cashier, and Brown, the subway trainman.

## V.

Alternatively, SEPTA contends that it should be granted a new trial because of trial errors.

■ (1) SEPTA urges that the trial court erred in permitting the testimony of Toombs' expert, Dr. Della Grossman, who suggested a decrease in Toombs' intelligence quotient score from 1972 to 1985. This testimony was relevant with respect to damages potentially attributable to Toombs' accident. Indeed, SEPTA's own expert testified to a higher score. We therefore find no abuse of discretion.

■ (2) SEPTA contends that Toombs' evidence concerning lost future earnings was too sketchy to be submitted to the jury. Toombs testified as to his prior employment history, and his experts testified as to his pre-accident potential and his now-limited economic horizons. The trial court did not err in permitting the jury to take lost future earnings into account in determining damages.

■ (3) SEPTA contends that the trial court erred in submitting the question of engineer Brown's negligence to the jury without expert testimony regarding the stopping distances and operation of subway trains. As the district court noted:

> Mr. Brown explained the basic mechanics of his job during his examination. He explained that he had a lever to make the train go forward, but no speedometer. As the train approached a station, he would first see the letter "O" on the wall, which meant "throw off power." The next letter, "B," meant "apply brakes." The brake had three positions, the third of which was the emergency brake.

The court concluded that the jury was fully competent to understand the basics of what Brown's job required, and that no expert on the operation of subway trains was required. We agree.

---

18. Having concluded that the vehicular liability exception applies to Toombs' cause of action, there is no reason for us to consider whether Toombs' cause of action could also fall within the real estate exception to the sovereign immunity statute. In any event, as we construe Toombs' action he does not allege that it was the condition of SEPTA's property that caused his injury. Rather, he has charged, and was successful in proving at trial, that it was Manning and Brown, the SEPTA employees, who acted negligently and thus breached their duty of care. *Mascaro v. Youth Study Center,* 514 Pa. 351, 523 A.2d 1118 (1987), is therefore inapposite.

(4) SEPTA contends that the trial court erred in instructing the jury regarding what use it could make of Toombs' admission that he had engaged in prior criminal conduct. SEPTA requested an instruction that this evidence could be used in assessing damages—in particular, in assessing lost future earnings. Toombs' admission of prior criminal activity anticipated the use of his criminal record for impeachment purposes. The court did not permit its use, substantively, on the damage issue. No other testimony was offered by SEPTA tending to show what effect Toombs' criminal record would have on his future earnings. The court's ruling with respect to jury considerations of Toombs' criminal record was a discretionary ruling on relevancy. *See* Fed.R.Evid. 403. We find no abuse of discretion.

In sum, none of the grounds relied on in support of SEPTA's new trial motion have merit, and the district court did not err in denying that motion.

## VI.

It was on July 29, 1986, that the district court awarded Toombs delay damages of $34,314.64 pursuant to Pennsylvania Rules of Civil Procedure 238. At that time, the Pennsylvania Supreme Court had yet to file its opinion in *Craig v. Magee Memorial Rehabilitation Center*, 512 Pa. 60, 515 A.2d 1350 (1986). On October 8, 1986, *Craig* was filed. In that case, the Pennsylvania Supreme Court suspended the mandatory feature of Rule 238 and held that specific findings concerning responsibility for delay must be made. SEPTA urges that a remand is appropriate on the delay damages issue so that the district court can make the required findings. Toombs conceded at oral argument that a remand is in order. In light of that concession we do not here address the effect in other cases of the decision in *Craig*.

## VII.

We hold that SEPTA is a "Commonwealth party" within the scope of 42 Pa. Cons.Stat.Ann. § 8501 (Purdon 1982), the Pennsylvania sovereign immunity statute,

and that the acts underlying Toombs' action fall within the vehicular liability exception of the statute. *Id.* § 8522.

We therefore will affirm the district court's judgment of $250,000 in favor of Toombs and against SEPTA. Because the district court had not conducted a hearing with respect to delay damages as now required by *Craig*, we will vacate so much of the district court's judgment of July 29, 1986 as pertains to delay damages only and will remand to the district court for compliance with the *Craig* requirements.

GIBBONS, Chief Judge, dissenting, with whom Judges BECKER and MANSMANN, Circuit Judges join:

We are presented in this appeal with the unenviable task of predicting what intention the Supreme Court of Pennsylvania would attribute to the 1978 Pennsylvania legislature on a subject that legislature did not have in mind. Since two members of this court who join in the opinion of the court were members of the 1978 Pennsylvania legislature, and one of the two has a more than passing acquaintance with the thought processes of the Supreme Court of Pennsylvania, disagreeing with them may appear presumptuous. Neither judge, of course, contends that he can speak definitively with regard to the intent of other members of those institutions. I cannot conscientiously predict that the Pennsylvania Supreme Court would interpret the 1978 legislation here in issue to be applicable to Southeastern Pennsylvania Transportation Authority (SEPTA). Thus while I join in Parts I, IV, V and VI of the majority's analysis, I dissent from Parts II and III, and from the judgment affirming the reduction of the verdict from $1,000,000 to $250,000.

### I.

In 1973 the Pennsylvania Supreme Court abolished governmental immunity. *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584. 305 A.2d 877 (1973). The court's abrogation of sovereign immunity came a few years later in *Mayle v.*

*Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978). Following *Mayle,* in September of 1978, the Pennsylvania General Assembly enacted a limited statutory sovereign immunity scheme. Act of Sept. 28, 1978, P.L. 788, No. 152 (codified as amended at 42 Pa.Cons.Stat. Ann. §§ 8521–8528 (Purdon 1982)). In November of 1978 it enacted a governmental immunity statute. The Political Subdivisions Tort Claims Act, Act of Nov. 26, 1978, P.L. 1399, No. 330 (codified as amended at 42 Pa.Cons.Stat.Ann. §§ 8541–8564).

The 1978 Acts were repealed in 1980 and reenacted as amended by the Act of Oct. 5, 1980, P.L. 693, No. 142. The 1980 Act included a sovereign immunity provision and a governmental immunity provision, 42 Pa.Cons.Stat.Ann. §§ 8501–8564—both of which were substantially identical to the 1978 Acts. These statutes recreated the immunity that state and local entities had enjoyed prior to abrogation of common-law immunity, but allowed the recovery of compensatory damages in certain situations. Because the 1980 amendments reflect no substantive differences from the original 1978 enactments, unless otherwise stated, references in this opinion will be to the 1978 Act, as currently codified, throughout this opinion. ·

The 1978 Acts represented a direct reaction to the Pennsylvania Supreme Court's decisions in *Ayala* and *Mayle.* *Ayala* and *Mayle* specifically abrogated Pennsylvania's long-standing doctrines of governmental and sovereign immunity. The statutes reinstated these doctrines; however, they also provided certain exceptions under which aggrieved parties might have limited recovery against the Commonwealth or governmental agencies. *See* 42 Pa.Cons. Stat.Ann. §§ 8522, 8542 (Purdon 1982).

Had the *Ayala* and *Mayle* decisions survived legislative scrutiny, they would have had important ramifications for those governmental agencies which had previously enjoyed absolute immunity from suit. In the case of SEPTA, however, the *Ayala* and *Mayle* decisions had no practical impact because, prior to their promulgation, SEPTA had always been fully subject to actions for compensatory damages.

The statute under which SEPTA operates specifically provides that it has the power "[t]o sue and be sued, implead and be impleaded, complain and defend in all courts...." Act of Aug. 14, 1963, P.L. 984, No. 450 § 4(d)(2) (codified as amended at 55 Pa.Stat.Ann. § 600.303(d)(2) (Purdon Supp. 1987)). Moreover, the statute provides for the creation of a damage reserve fund:

> The board shall withdraw from the gross receipts of the authority and charge to operating expenses such an amount of money as, in the opinion of the board, shall be sufficient to provide for the adjustment, defense and satisfaction of all suits, claims, demands, rights and causes of action, and the payment and satisfaction of all judgments entered against the authority for damage caused by injury to or death of any person and for damage to property resulting from the construction, maintenance, and operation of the transportation system, and the board shall deposit such moneys in a fund to be known and designated as damage reserve fund....

Act of Aug. 14, 1963, P.L. 984, No. 450, § 34 (codified as amended at 66 Pa.Stat.Ann. § 2034 (Purdon Supp.1975) (repealed 1980)), *reenacted at* 55 Pa.Stat.Ann. § 600.338 (Purdon Supp.1987).

These provisions obviously anticipated that SEPTA would be liable in tort actions. It is thus clear that SEPTA, from its inception, did not enjoy governmental or sovereign immunity. This conclusion is borne out by the judgments awarded against SEPTA prior to the abrogation of sovereign immunity by *Mayle* and the promulgation of the 1978 immunity statutes. *See, e.g., Lebesco v. Southeastern Pa. Transp. Auth.,* 251 Pa.Super. 415, 380 A.2d 848 (1977); *Ottaviano v. Southeastern Pa. Transp. Auth.,* 239 Pa.Super. 363, 361 A.2d 810 (1976); *Wright v. Southeastern Pa. Trans. Auth.,* 239 Pa.Super. 165, 361 A.2d 389 (1976).

Consequently, the primary question addressed in this appeal is whether SEPTA's undoubted amenability to suit in tort prior to *Ayala* and *Mayle* was eliminated by the legislative reaction to those decisions. In other words, did Pennsylvania's 1978 immunity statutes merely reestablish the state of immunity that existed prior to *Ayala* and *Mayle*, or did the statutes extend the benefits of immunity to agencies like SEPTA which had never before enjoyed such protections? Only if the statutes are viewed as extending the ambit of immunity beyond its pre-*Ayala/Mayle* parameters can the district court's decision be affirmed.

## II.

Neither SEPTA nor the majority opinion points to any legislative history of the 1978 statutes which suggests that the legislature had metropolitan regional transportation authorities in mind when it reinstated governmental and sovereign immunity. In fact, the limited available history of the 1978 immunity statutes supports the opposite conclusion—i.e., that these statutes were not intended to confer immunity on agencies which did not enjoy immunity prior to the *Ayala* and *Mayle* decisions. In signing the first post-*Mayle* immunity provision into law, Act of Sept. 28, 1978, P.L. 788, No. 152 (codified as amended at 42 Pa. Cons.Stat.Ann. §§ 8521–8528), Pennsylvania Governor Milton J. Shapp stated that he did not view the statutes as conferring immunity on agencies which did not enjoy immunity prior to *Ayala* and *Mayle*:

It is my intention in approving this act that [it] shall have general retroactive effect; and in particular it is the specific intent that:

... In all cases where the cause of action [does not fall within one of the exceptions to immunity enumerated herein], regardless of when it arose, the cause of action shall be barred and sovereign immunity shall continue as a defense: *Provided, that an action that*

*would not have been barred by the applicable statutory or decisional law as it existed* [prior to the *Mayle* decision] shall not be barred . . . .

Governor's Message in Approving Act of Sept. 28, 1978, P.L. 788, No. 152 (emphasis added).[1] Certainly, this language does not support the position that the 1978 immunity provisions were intended to extend immunity beyond its pre-*Mayle* parameters. The majority urges that the Governor's reference is to the statute of limitations, but before one gets to a time bar there must be a cause of action to be barred, and such causes of action are referred to. And while the remarks of Representative Berson quoted in footnote 10 of the majority opinion may have the limited significance attributed to them by Judge Garth, they certainly cannot be construed to support the proposition that the legislature intended to do more than overrule *Ayala* and *Mayle*.

The text of the 1978 statutes themselves also suggests that they were not intended to confer immunity on entities which did not enjoy immunity prior to the *Ayala* and *Mayle* decisions. The opening provision of the first act declares the legislative intent:

[I]t is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, *shall continue* to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

Act of Sept. 28, 1978, P.L. 788, No. 152, § 1 (emphasis added) (codified at 1 Pa.Cons. Stat.Ann. § 2310 (Purdon Supp.1987)). The use of the phrase "shall continue" indicates that the legislature intended to retroactively restore immunity to those entities which had been protected by immunity prior to the *Mayle* decision, not that it intended to confer immunity upon entities which had not previously enjoyed immunity. In

---

1. While an executive's statement is not determinative, his views upon approval of a bill are certainly relevant to the determination of a law's meaning. *See, e.g., Berry v. Dept. of Jus-*

*tice,* 733 F.2d 1343, 1349–50 (9th Cir.1984); *Clifton Mayhew, Inc. v. Wirtz,* 413 F.2d 658, 661–62 (4th Cir.1969).

addition, the legislature specifically provided:

> Section 5. Construction and application. (a) This act is intended to specifically respond to and prescribe the limitations on the decision of *Mayle v. Commonwealth*, decided by the Supreme Court on July 14, 1978.

Act of Sept. 28, 1978, P.L. 788, No. 152, § 5, 42 Pa.Cons.Stat.Ann. § 8522 note (Historical Note). Thus the legislature has instructed the courts to construe the Act, not simply the retroactivity provisions, as a response to the *Mayle* decision.

Other provisions of the statute are in conformity with this intent. In the section waiving sovereign immunity in certain instances, the legislature speaks of "damages [which] would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity." 42 Pa.Cons.Stat. Ann. § 8522(a). Similarly, in the section waiving governmental immunity in certain instances, the legislature speaks of "damages [which] would be recoverable ... if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity) ...." 42 Pa. Cons.Stat.Ann. § 8542(a)(1) (Purdon 1982). The negative inference suggested by these passages is that the legislature intended to do no more than restore, in part, the sovereign immunity and governmental immunity which Commonwealth agencies and local agencies enjoyed prior to *Ayala* and *Mayle*, and that it did not intend to extend it to entities which never had either form of immunity.

The majority opinion reaches the contrary conclusion based almost exclusively on the Pennsylvania Supreme Court's opinion in *Feingold v. Southeastern Pa. Transp. Auth.*, 512 Pa. 567, 517 A.2d 1270 (1986). *Feingold*, however, dealt only with the issue of SEPTA's common law immune status with respect to the assessment of *punitive* damages. Although the *Feingold* court referred to SEPTA generally as a "Commonwealth agency," it declined to decide the issue of SEPTA's status for the purpose of Pennsylvania's immunity statutes. *See Feingold*, 512 Pa. at 580 & n. 8, 517 A.2d at 1276–77 & n. 8.

Significantly, a survey of extant Pennsylvania case law establishes that SEPTA's status as a Commonwealth agency has historically depended on the particular statute or statutory scheme being considered. *See Graffigna v. City of Philadelphia*, 98 Pa. Commw. 624, 512 A.2d 91 (1986) (SEPTA is "government unit" for purposes of statute requiring written notice to any "government unit" of intent to sue for personal injuries); *Fisher v. Southeastern Pa. Transp. Auth.*, 60 Pa.Commw. 269, 431 A.2d 394 (1981) (SEPTA employees held not to be employees of the Commonwealth for purposes of 1935 statute providing compensation to Commonwealth employees for active duty of reservists of military); *Scott v. Shapiro*, 19 Pa.Commw. 479, 339 A.2d 597 (1975) (SEPTA not considered Commonwealth agency within meaning of jurisdictional provisions of Pennsylvania Sunshine law); *Southeastern Pennsylvania Transp. Auth. v. Kohn*, 18 Pa. Transp. Auth. v. Kohn, 18 Pa.Commw. 546, 336 A.2d 904 (1975) (SEPTA not Commonwealth agency for purposes of provision giving Commonwealth Court exclusive jurisdiction over statewide agencies or instrumentalities of state government). Because the *Feingold* decision neither interprets a statutory scheme nor identifies SEPTA's character for the purposes of such a scheme, it should not be considered controlling in the determination of SEPTA's status under Pennsylvania's sovereign immunity statutes.

Nevertheless, the majority urges that "[w]hile *Feingold* did not deal directly with the question of SEPTA's status under the immunity statute, the [*Feingold*] court's analysis recognized the fact that SEPTA as a Commonwealth agency, was no longer protected by common-law sovereign immunity against *compensatory* damages." *See* maj. op. *supra* at 462 (citation omitted). The majority relies on the following language from *Feingold*:

Since the abolition of the common law doctrine of sovereign immunity, victims may now recover compensatory damages for injuries negligently caused by the Commonwealth and its agents. *See Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978); 42 Pa.C.S. § 8501 *et seq.* Thus, we are not here faced with a situation where the person who has been injured will be left without recourse.

512 Pa. at 580, 517 A.2d at 1276–77 (footnote omitted). A plausible interpretation of this language, adopted by the majority, is that the *Feingold* court was hinting that Pennsylvania's sovereign immunity statutes actually delimit SEPTA's potential liability for compensatory damages. Equally plausible, however, is the interpretation that the *Feingold* court was simply recognizing that SEPTA could be held liable for compensatory damages, but that the court chose not to determine whether such responsibility stems from SEPTA's traditional liability at common law or from Pennsylvania's sovereign immunity statutes. In view of *Feingold*'s unspecific language, I believe this latter interpretation to be the more appropriate of the two.

This latter interpretation becomes truly compelling when one considers the majority's dismissal of the Pennsylvania Supreme Court's decision in *Reilly v. Southeastern Pa. Transp. Auth.*, 507 Pa. 204, 489 A.2d 1291 (1985). The Pennsylvania Supreme Court in *Reilly* upheld a compensatory damage award of over $2,000,000 against SEPTA. At first blush, then, *Reilly* seems to support the view that SEPTA is not protected by the $250,000 cap on compensatory damages provided under Pennsylvania immunity statutes. *See* 42 Pa.Cons.Stat.Ann. § 8528(b). In *Reilly*, however, the cause of action accrued in February, 1978—six months before Pennsylvania's first immunity statute was adopted—and the Pennsylvania Supreme Court has determined that the Commonwealth's immunity statutes are not to be afforded retroactive application. *See Gibson v. Commonwealth*, 490 Pa. 156, 415 A.2d 80 (1980). Consequently, the majority concludes, quite properly I believe, that

*Reilly* has no bearing on SEPTA's potential liability under Pennsylvania's immunity statutes. *See* maj. op. *supra* at 461, n. 12.

The significance of the majority's treatment of *Reilly* is that it suggests that this court should also treat *Feingold* as nonprecedential. In *Feingold*, as in *Reilly*, the cause of action accrued before any of Pennsylvania's immunity statutes were adopted. Given the recognition that Pennsylvania's immunity statutes are not to be applied retroactively, this court simply cannot conclude that *Feingold* was referring to SEPTA's status under these statutes when it stated that the plaintiff there would have an avenue for recovering compensatory damages. Rather, the *Feingold* decision must have been referring to SEPTA's long-recognized amenability to compensatory damage suits under Pennsylvania common law. If, as the majority urges, *Reilly* cannot be viewed as providing any guidance as to SEPTA's immune status after Pennsylvania's sovereign immunity statutes were enacted, then *Feingold*, a case in which the cause of action accrued four years earlier than in *Reilly*, also cannot be seen as providing this court with relevant guidance. In sum, *Feingold* can only be read for the proposition that, under Pennsylvania common law, SEPTA was not liable for punitive damages either before or after the enactment of Pennsylvania's sovereign immunity statutes. The majority's reliance on *Feingold* for any alternate or additional proposition is misplaced.

When the question is presented to the Pennsylvania Supreme Court, I predict that it will hold that the 1978 statute had no effect on SEPTA's liability. Therefore, I would hold that SEPTA may not take advantage of the limitation of liability contained in either 42 Pa.Cons.Stat.Ann. § 8528(b) or 42 Pa.Cons.Stat.Ann. § 8553(b), and I would restore the $1,000,000 verdict.